**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALI VANDEVAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RENAL ASSOCIATES HOLDINGS, INC., JOSEPH A. CARLUCCI, JASON M. BOUCHER, and JONATHAN L. WILCOX,<br><br>Defendants. | Case No. 2:19-cv-09074-ES-MAH |

# CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiff the City of Hialeah Employees' Retirement System ("Hialeah" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned counsel, bring this federal securities class action against American Renal Associates Holdings, Inc. ("American Renal" or the "Company"), American Renal's Chief Executive Officer ("CEO") and Chairman of the Board of Directors Joseph A. Carlucci ("Carlucci"), American Renal's former Vice President and Chief Financial Officer ("CFO") Jason M. Boucher ("Boucher"), and American Renal's former Vice President and CFO Jonathan L. Wilcox ("Wilcox"). Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are is upon counsel's investigation, which included review and analysis of, *inter alia*: (i) regulatory filings made by American Renal with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases and media reports issued by and disseminated by the Company; (iii) analyst reports concerning American Renal; (iv) interviews with former American Renal employees; (v) news articles; (vi) other publicly available information concerning Defendants; and (viii) consultation with experts, including a forensic accounting expert. Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of American Renal between August 10, 2016 and March 27, 2019, both dates inclusive

(the "Class Period"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against American Renal, its CEO Defendant Carlucci, and two former Vice Presidents and CFOs who held those positions during portions of the Class Period, Defendants Boucher and Wilcox. Defendants made materially false statements concerning American Renal's financial results, including that they were prepared in compliance with Generally Accepted Accounting Principles (GAAP")[1] and the adequacy of their internal controls.

2. American Renal operates dialysis clinics and is the largest dialysis services provider in the United States. American Renal is structured such that the Company operates each clinic as a joint venture partnership with the physicians providing care in that clinic. In this joint venture model, the Company partners primarily with local nephrologists to develop, own and operate dialysis clinics. American Renal generally has the controlling interests in each of these clinics.

3. American Renal derives the major component of its revenues from dialysis treatments and related services. As a result, one key metric reported by the Company in its financial statements is net patient service operating revenues, which, according to the American Renal's 2018 Form 10-K, is reported at the amounts that reflect the consideration to which the Company expects to be entitled in exchange for providing dialysis treatments and related services. The consideration the Company expects to receive in exchange for its services depends on who is the payor. Medicare and Medicaid cover the costs for many of the patients that receive the Company's services, and those payment amounts are set by statutes and regulations. Other patients

---

[1] GAAP is a combination of authoritative standards (set by policy boards) and the commonly accepted ways of recording and reporting accounting information. GAAP aims to improve the clarity, consistency, and comparability of the communication of financial information.

are covered by private insurance, and the amounts paid for the services provided to those patients are based on rates that are agreed to by contract between the Company and those private insurance carriers. For other payors, including uninsured patients, the Company would consider various factors in determining the price, including usual and customary rates, discounts in accordance with Company policy, and the Company's historical experience with that payor.

4. American Renal has now admitted that during the Class Period it did not properly account for its revenues, and misreported other key accounting metrics. Specifically, among other things, the Company's methodology for reserving contractual allowances did not reconcile revenue and accounts receivable to the Company's collection experience and actual cash collections. Defendants' failure to construct the proper methodology and resulting failure to use accurate historical results led the Company to report materially false figures for numerous key financial metrics relied upon by the market to gauge American Renal's performance, including net patience service operating revenues, accounts receivable, operating income, net income, net income attributable to American Renal, and adjusted EBITDA.

5. On March 27, 2019, the Company announced that its previously-reported financial results for the years 2014 through 2017 as well as its previously-reported quarterly financial results from 2016 through 2018 should no longer be relied upon and would be restated. The Company also announced that management's previous assessment of internal control over financial reporting should no longer be relied upon. Finally, the Company announced the resignation of Defendant Boucher as Vice President and Chief Financial Officer, who had held that position for less than 6 months. Defendant Boucher was appointed CFO upon the September 30, 2018 resignation of Defendant Wilcox from that same position, which occurred shortly before the SEC requested that the American Renal voluntarily provide documents and information relating to certain revenue

recognition, collections and related matters. Two days later, on March 29, 2019, the Company announced that it received a subpoena from the Staff of the SEC, which reiterated the SEC's prior request and required the production of additional documents and information relating to the inability to rely on the Company's previously issued consolidated financial statements and previous assessment of internal control over financial reporting. On June 19, 2019, the Company received an additional subpoena from the Staff of the SEC, which required the production of additional related documents and information.

6. On September 5, 2019, the Company issued its restated financials for fiscal years 2014 through 2017 and quarterly financial results for 2016 through the third quarter of 2018 (the "Restatement"). Although the Company restated over two years of financial results and indicated generally why each financial metric was misstated, the Company failed to explain in any detail what caused the conditions that allowed for numerous metrics to be falsely reported.

7. In addition to restating its financial results, the Company admitted that throughout the Class Period it did not maintain an effective control environment in connection with the revenue recognition process, accounting for income taxes and noncontrolling interests and review and approval of journal entries. American Renal further admitted that it failed, *inter alia*, to invest in an adequate environment of controls and to "employ personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with the increasing size of the entity and nature of the complexity of [its] financial reporting requirements." 2018 10-K at 121. As a result of these inadequate controls, the Company falsely reported numerous line items (over 30) in each of the reporting periods during the Class Period (and before) and were forced to restate them.

8. Despite Defendants' admitted failure to employ the proper methodology for

reserving contractual allowances, a vital exercise in order to properly report the financial results for the business that supplied the Company's main source of revenue, and their failure to even employ appropriate personnel with regard to the American Renal's financial reporting, Defendants continuously assured the market during the Class Period that the Company employed sufficient controls and certified the accuracy of the Company's financial results. Defendants made these representations despite their hands-on involvement in monitoring the billing and collections for services at the Company. In fact, Defendants Carlucci and Boucher falsely certified in American Renal's third quarter 2018 financial results that the Company had adequate controls over the Company's financial reporting even after the staff of the SEC "requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collections and related matters." Ultimately, the Company would admit that the Certification of Defendants Carlucci and Boucher were false.

9. Within the Restatement, the Company listed the resignation of Defendant Boucher as one of the remedial measures taken to fix the Company's intern controls. Although Defendant Boucher had only been the CFO for less than six months, he had worked closely with the Company's previous CFO, Defendant Wilcox, for seven years, first as the Company's Vice President of Finance and then also as Chief Accounting Officer and Treasurer. The Company also announced that the Board required that Defendant Carlucci return over $880,000 in bonuses that were previously paid to him on the basis of the achievement of a target of a financial metric that had to be restated and that Defendant Carclucci would voluntarily forego any contractual entitlements to non-equity based incentive compensation and equity awards with respect to 2019. Despite these announcements, the Company failed to explain in any detail the circumstances of how or why Defendants allowed the control environment to become completely deficient.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business within this District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff the City of Hialeah Employees' Retirement System, as set forth in its attached Amended Certification, acquired American Renal securities at artificially inflated prices during the Class Period and suffered damages as a result of the conduct complained of herein. On July 2, 2019, the Court appointed Hialeah as Lead Plaintiff for this litigation.

15. Defendant American Renal describes itself as "the largest dialysis provider in the United States focused exclusively on joint venture partnerships with physicians." The Company is incorporated in Delaware and has locations in New Jersey. American Renal's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ARA." American Renal operates dialysis clinics and is the largest dialysis services provider in the United States focused exclusively on joint venture partnerships with physicians.

16. Defendant Joseph A. Carlucci ("Carlucci") co-founded American Renal and has served as its Chief Executive Officer ("CEO") since 2006 and Chairman of the Board of Directors since 2012. As CEO and Chairman of the Board of American Renal, Carlucci was involved in all aspects of the Company. Throughout the Class Period, Defendant Carlucci made materially false statements in American Renal's public filings with the SEC, publicly disseminated press releases, conference calls with investors and analysts, as well as signing the Company's annually filed Forms 10-K. With respect to the Restatement, the American Renal Board required that Defendant Carlucci return over $880,000 in bonuses that were previously paid to him on the basis of the achievement of a target of a financial metric that had to be restated and that he would voluntarily forego any contractual entitlements to non-equity based incentive compensation and equity awards with respect to 2019.

17. Defendant Jason M. Boucher ("Boucher") served as Vice President and Chief Financial Officer ("CFO") of American Renal from October 1, 2018 until March 26, 2019. Prior to that, he served as the Company's Vice President of Finance beginning in May 2011 and as Chief Accounting Officer Treasurer beginning in January 2017. Throughout the Class Period, Defendant Carlucci made materially false statements in American Renal's public filings with the SEC, publicly disseminated press releases, conference calls with investors and analysts, as well as signing the Company's annually filed Forms 10-K and third quarter 2018 Form 10-Q. Defendant Boucher resigned as a result of the Company's having ineffective controls and reporting false financial results.

18. Defendant Jonathan L. Wilcox ("Wilcox") served as Vice President and CFO of American Renal from 2011 until September 30, 2018. During the Class Period until his resignation on September 30, 2018, Defendant Wilcox made materially false statements in American Renal's

public filings with the SEC, publicly disseminated press releases, conference calls with investors and analysts, as well as signing the Company's annually filed Forms 10-K and quarterly filed Forms 10-Q.

19. Defendants Carlucci, Boucher, and Wilcox are sometimes referred to herein as the "Individual Defendants."

20. Each of the Individual Defendants: (i) directly participated in the management of the Company; (ii) was directly involved in the day-to-day operations of the Company at the highest levels; (iii) was privy to confidential proprietary information concerning the Company and its business and operations; (iv) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false statements and information alleged herein; (v) was aware of or recklessly disregarded the fact that the false statements were being issued concerning the Company; and/or (vii) approved or ratified these misleading statements in violation of the federal securities laws.

## BACKGROUND AND NATURE OF THE FRAUD

### Background of American Renal's Business

21. In its 2017 Form 10-K, American Renal described itself as the "the largest dialysis services provider in the United States focused exclusively on joint venture partnerships with physicians." American Renal operates dialysis clinics and, according to its 2017 Form 10-K, "provides high quality patient care and clinical outcomes to patients suffering from end-stage renal disease." According to the Company, patients suffering from end-stage renal disease generally require dialysis at least three times a week for the rest of their lives, unless the patient receives a kidney transplant. In its joint-venture model, the Company "share[s] the ownership and operational responsibility of our dialysis clinics with our nephrologist partners and other joint venture partners, while the providers of the majority of dialysis services in the United States

operate through a combination of wholly owned subsidiaries and joint ventures. Substantially all of our clinics are maintained as separate joint ventures in which generally we have the controlling interest and our nephrologist partners and other joint venture partners have a noncontrolling interest."

22. The major component of the Company's revenues is the delivery of dialysis treatments and related services to patients. A key metric of the Company's financial performance is net patient service operating revenue, which is to be reported at the amounts that reflect the consideration to which the Company expects to be entitled or received in exchange for providing dialysis treatments and related services. Payments to American Renal are principally made from government-based programs, including Medicare, Medicaid and state workers' compensation programs, commercial insurance payors and other sources such as the U.S. Department of Veterans Affairs (the "VA"), hospitals as well as patient self-pay.

23. While the Company maintains a usual and customary fee schedule for dialysis treatment and these other related services, the transaction price for those services is normally recorded at a discount to the Company's usual and customary fee schedule and ***the amount received by American Renal is variable depending on who is the payor***. The prices for services provided to a patient covered by Medicare or Medicaid programs are set by statutes and regulations. Prices for services provided to patients covered by contracted payors (in-network private insurance) are based on contracted rates between the Company and those private insurance contracted providers. For other payors, the "Company determines the transaction price based on usual and customary rates for services provided, reduced by contractual adjustments provided to third-party payors, discounts provided to uninsured patients in accordance with the Company's policy, and/or implicit price concessions." 2018 10-K at 79. Those estimates of price concessions

are determined based on the Company's historical collection experience with each payor.

**American Renal Failed to Design and Maintain an Effective Control Environment**

24. Although the Company admits that "[a]n effective control environment is the foundation for the discipline and structure necessary for effective internal control over financial reporting" (2018 10-K at 121), beginning in at least as early as 2013, American Renal failed to design and maintain an effective control environment in connection with its revenue recognition process, including the accounting for net patient service operating revenues, net accounts receivable and amounts due to payors, as well as other processes. It is fundamental that in order to properly monitor and assess the amount of revenue, contractual allowances and allowance for doubtful accounts that should be recorded from dialysis treatment, the Company must track and analyze, in part, actual payment receipts, historical collection experience, settlement of audits, reviews and investigations, and specific information from the patient's health plan.

25. American Renal failed to invest the time and resources required to ensure its control environment was adequate. The Company failed to establish adequate controls to ensure compliance with appropriate accounting policies, and also failed to implement controls to ensure that its financial statements were prepared in accordance with GAAP. Further, as American Renal grew, it failed to employ personnel with an appropriate level of knowledge, experience and training in the application of GAAP. Specifically, American Renal did not design and maintain effective controls over accounting estimates, including the completeness, accuracy and valuation of changes in estimates related to the recognition of net patient service operating revenues and specific transaction-related estimates of insurance plan repayments and failed to timely and appropriately reconcile net accounts receivable balances and amounts due to payors with subsequent cash receipts. The Company failed to properly track and consider actual payment receipts from payors,

collection experience including the settlement of audits, reviews and investigations, and specific information from the patient's health plan. This led to the misstatement of net patient service operating revenues, including contractual allowances, allowances for uncollectible accounts and amounts due to payors, as discussed below. These misstatements also involved the way that American Renal calculated its income taxes and the fair value of Noncontrolling Interests subject to puts, both of which were corrected in the Restatement.

26. The Company's inadequate process for internally communicating information within the accounting department and between and among other groups (such as the groups responsible for revenue recognition, accounts receivable and income taxes) contributed to American Renal's failure to maintain an effective control environment and ultimately resulted in the misstatement of net patient service operating revenues, including contractual allowances, allowances for uncollectible accounts and amounts due to payors.

27. American Renal did not design and maintain effective review controls over the completeness, existence, accuracy and presentation of current and deferred income taxes. As a result, income tax expenses and related interest was recorded in the wrong period.

28. Further, American Renal did not maintain effective controls over the review of analyses and schedules used to determine the carrying value of noncontrolling interests subject to put rights. As a result, errors that existed in the schedules used to determine the carrying value of non-controlling interests, were not detected. This required American Renal to reclassify certain equity balances.

29. Further yet, American Renal did not maintain effective controls over the calculation of the gain/loss on the sale and/or closure of dialysis clinics. Specifically, American Renal failed to consider goodwill in the calculation of the gain/loss associated with the sold/closed dialysis

clinics.

**American Renal Misrepresents its Financial Results**

30. As alleged in ¶¶48-75 below, throughout the Class Period, American Renal was required to prepare its financial statements in accordance with GAAP, the accounting principles accepted in the United States of America. Correspondingly, Defendants repeatedly assured investors during the Class Period that American Renal in fact did prepare its financial statements in accordance with GAAP. However, American Renal failed to prepare its financial statements in accordance with GAAP because the Company improperly: (1) recognized net patient service operating revenue, (2) calculated contractual allowances, allowances for uncollectible accounts, and amounts due to payors, (3) determined the fair value of noncontrolling interest subject to puts, (4) accounted for noncontrolling interests subject to put provisions, (5) calculated the gain or loss on the sale and/or closure of dialysis clinics, and (6) accounted for certain income tax provisions, in a manner that violated GAAP. In doing so, American Renal's financial statements incorporated into those SEC Forms 10-Q and 10-K filed during the Class Period were materially misstated and the Company's public statements pertaining to its financial results were false.

**Events Leading Up to the Restatement**

31. On November 9, 2018, the Company filed a Form 10-Q reporting its third quarter 2018 financial results with the SEC. In that Form 10-Q, American Renal disclosed that during the previous month the staff of the SEC "requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collections and related matters." On this news, share price of American Renal fell $0.74 (over 4%) to close at $10.46 on the next trading day, November 12, 2018, on higher than usual trading volume.

32. Notwithstanding the SEC inquiry, Defendants continued to state that the

Company's controls and procedures were effective at reasonable assurance levels and to execute Section 302 Certifications pursuant to the Sarbanes Oxley Act of 2002, attesting, *inter alia*, that the financial information contained in the Company's SEC filings were true, did not omit material facts, and that the Company's disclosure controls and procedures were effective.

33. Just four months later, on March 8, 2019 American Renal filed a Form NT 10- K with the SEC, announcing it would delay the filing of its earnings report for the fiscal year ended December 31, 2018 as it continued to examine reserve computations and other accounting practices that may have an impact on the Company's accounts receivable and revenue for 2018, as well as previously reported fiscal years ranging from 2014 through 2017. On this news, shares of American Renal fell $2.05 per share or over 16% to close at $10.46 per share on March 8, 2019 on extremely high volume.

34. On March 27, 2019, the last day of the Class Period, American Renal announced that investors should no longer rely upon the Company's previously issued consolidated financial statements and other financial data for the fiscal years ended December 31, 2014, 2015, 2016 and 2017 contained in its Annual Reports on Form 10-K for the years ended December 31, 2016 and 2017, and its condensed consolidated financial statements for the quarters and year-to-date periods ended March 31, June 30, and September 30 in 2016, 2017 and 2018 in the Company's Forms 10-Q. American Renal also announced that investors should no longer rely upon the Company's previous assessment of internal control over financial reporting. The Company also announced that Defendant Boucher resigned as the Company's Vice President and Chief Financial Officer effective March 26, 2019. On this news, share price of American Renal fell $3.69 (or 38%) to close at $6.01 on March 28, 2019, on extremely high volume.

35. On March 29, 2019, the Company announced that it received a subpoena from the

Staff of the SEC, which reiterated the SEC's prior request and required the production of additional documents and information relating to the inability to rely on the Company's previously issued consolidated financial statements and previous assessment of internal control over financial reporting. On June 19, 2019, the Company received an additional subpoena from the Staff of the SEC, which required the production of additional related documents and information.

36. On September 5, 2019, American Renal finally issued its Form 10-K for the year ended December 31, 2018 which provided, therein, direct acknowledgement of several accounting improprieties, ultimately resulting in revisions of certain amounts reported in previously issued quarterly and annual financial statements as well as acknowledging that the American Renal's internal control over financial reporting was ineffective despite assurances to the contrary issued during the Class Period.

37. The identified and purportedly-corrected misstatements, as reflected in the revised financial statements issued on September 5, 2019, indicate that originally-reported patient service operating revenues, provision for uncollectible accounts, net patient service operating revenue, operating income, net income, and net income (loss) attributable to American Renal Associates Holding, Inc. (among other accounts), were materially misstated during the Class Period and therefore unreliable. Specifically, the Company admitted to violating GAAP in connection with its recognition and reporting of revenue, contractual allowances, accounts receivable, noncontrolling interest subject to puts, gain or loss on the sale and/or closure of dialysis clinics, and income taxes for fiscal years 2014, 2015, 2016, 2017, as well as each of the quarters therein and the first three quarters of fiscal 2018. This admission was contained in American Renal's 2018 Form 10-K, which stated as follows:

***The Restatement***

*Background*

In our Quarterly Report on Form 10-Q for the quarter ended September 30, 2018, we disclosed that in October 2018, the Staff of the SEC requested that we voluntarily provide documents and information relating to certain revenue recognition, collections and related matters. Following receipt of the SEC request, we responded by producing documents and information to the Staff. In addition, as previously disclosed in our Current Report on Form 8-K filed March 8, 2019, the Audit Committee (the "Audit Committee") of our Board of Directors (the "Board") began a review of our revenue recognition methodology and related accounting matters, including internal control over financial reporting related to revenue recognition and related matters, with the assistance of legal counsel that reports to the Audit Committee, as well as independent accounting advisors retained by the Audit Committee's counsel.

In connection with the review of the matters described above, on March 21, 2019, the Board in conjunction with management concluded that our previously issued consolidated financial statements and other financial data for the Restated Periods should be restated and should no longer be relied upon for the reasons described below. The Board also determined that our disclosures related to these financial statements and related communications issued by or on behalf of us with respect to the Restated Periods, including management's assessment of internal control over financial reporting, should no longer be relied upon. The determination by the Board was made in conjunction with management and upon the recommendation of the Audit Committee as a result of the review described above.

During the course of its review, the Audit Committee in conjunction with management concluded that our consolidated financial statements for the Restated Periods were not prepared in accordance with generally accepted accounting principles ("GAAP") and required the adjustments described below under "—Effects of Restatement" for the Restated Periods. The Audit Committee also concluded that our lack of adequate internal control over financial reporting relating to these matters for the Restated Periods constituted the material weaknesses in internal control over financial reporting described below in "—Material Weaknesses."

The Audit Committee's review of our financial statements for the Restated Periods is now complete. However, the related SEC investigation is ongoing. Following our disclosure of the Board's conclusion that we needed to restate our previously issued consolidated financial statements for the Restated Periods, on March 28, 2019, we received a subpoena from the Staff of the SEC, which reiterated the SEC's prior request and required the production of additional documents and information relating to, among other things, the Audit Committee's review and the determination to conduct the Restatement. On June 19, 2019, we received an additional subpoena from the Staff of the SEC, which required the production of additional related documents and information. We may receive additional related subpoenas or other requests for documents and information from the Staff. We have cooperated fully with this investigation and

will continue to do so. We refer to the SEC's investigation, including the inquiry that commenced in October 2018, as the "SEC Investigation."

*Effects of Restatement*

On a cumulative basis, including fiscal year 2013 and periods prior to 2013, the restatement adjustments resulted in a net increase to income before income taxes of $5.4 million, while the restatement adjustments related to the Restated Periods resulted in a net decrease to income before income taxes of $15.2 million. Consistent with our historical reporting convention, income before income taxes is presented before net income attributable to noncontrolling interests. These adjustments also resulted in a [sic] increase of previously reported accumulated deficit of $23.9 million as of September 30, 2018. In "Note 3 - Restatement of Consolidated Financial Statements" of the notes to the consolidated financial statements, we disclose the nature of the restatement items and adjustments and highlight the impact of the restatement items on the various financial statement captions for December 31, 2017 and 2016. For information on the impact of the restatement on 2015 and 2014, see "Item 6. Selected Financial Data," in this Annual Report on Form 10-K. See "Note 26 - Selected Quarterly Financial Data (Unaudited)" of the notes to the consolidated financial statements for the impact of the restatement items on the consolidated financial statements for specified interim quarterly and year-to-date periods for the years ended December 31, 2018, 2017, and 2016.

The primary categories of adjustments are described below.

- *Revenue recognition and accounts receivable* - Our methodology for reserving for contractual allowances did not reconcile revenue and accounts receivable to our collection experience and actual cash collections. The restated amounts for each of the Restated Periods consider actual cash collections associated with the dates of service in each relevant period.

- *Noncontrolling interests subject to puts* - Based on the adjustments related to revenue recognition and accounts receivable, we adjusted the estimated fair value of noncontrolling interests subject to puts for the relevant periods. In addition, we did not correctly account for noncontrolling interests subject to put provisions during the Restated Periods, therefore we have reclassified certain equity balances. The reclassifications had no impact on income before income taxes or net income.

- *Clinic dispositions* - Our gain or loss calculation for the sale and/or closure of dialysis clinics did not consider all relevant accounts. The restated amounts for each of the Restated Periods include the impact of all relevant accounts, including goodwill.

- *Income taxes* - Adjustments to income taxes were made for the income tax effects of the revenue recognition and accounts receivable adjustments described above. In addition, we did not correctly account for certain income tax provisions during the Restated Periods, causing income tax expenses and related interest to be accrued incorrectly in those periods.

- *Net income attributable to noncontrolling interests* - The adjustments related to net income attributable to noncontrolling interests are due to the impacts of the other adjustments noted above.

- *All other restatement adjustments* - We had adjustments not otherwise described above that are individually insignificant to previously reported income from operations before income taxes.

In addition, the Company made certain reclassification entries which are described below:

- *Clinic dispositions* - In addition to the adjustment noted above related to clinic dispositions, in certain circumstances, we presented the gain or loss as a component of patient care costs rather than as a component of general and administrative expenses. We have reclassified the adjusted gain or loss to general and administrative expenses where applicable. The reclassifications had no impact on income before income taxes or net income.

- *Non-income-based tax* - We reclassified non-income-based tax expenses that were misclassified as income tax expense to general and administrative expense and patient care costs as applicable. The reclassifications had no impact on net income.

(2018 Form 10-K at 4, 5).

38. American Renal admitted in its 2018 Form 10-K that material weaknesses in its internal control over financial reporting "contributed to the need for material adjustments to the financial statements for the year ended December 31, 2018 and the restatement of [American Renal's] consolidated financial statements for the years ended December 31, 2017 and 2016 and other financial information for the quarters and year-to-date periods ended March 31, June 30 and September 30, 2018; March 31, June 30 and September 30, 2017; and March 31, June 30 and September 30, 2016, and selected financial data…for the years ended December 31, 2015 and

2014." (2018 Form 10-K, at 122.)

39. A material weakness is defined as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." (Auditing Standard No. 5, *An Audit Of Internal Control Over Financial Reporting That Is Integrated With An Audit Of Financial Statements*, A7).

40. American Renal management identified material weaknesses in the following areas:

> ***Control Environment***
>
> An effective control environment is the foundation for the discipline and structure necessary for effective internal control over financial reporting. We did not maintain an effective control environment in connection with the revenue recognition process, accounting for income taxes and noncontrolling interests and review and approval of journal entries. As our Company grew, this was evidenced by our failure to: (i)(a) invest in, prioritize and support an adequate environment of controls, (b) establish and support adequate controls relating to compliance with appropriate accounting policies and procedures, and (c) implement controls that were adequately designed and operating effectively, thereby enabling our preparation of financial statements to be in accordance with GAAP; and (ii) employ personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with the increasing size of the entity and nature and complexity of our financial reporting requirements.
>
> ***Control Activities***
>
> - *Revenue, Accounts Receivable and Amounts due to Payors*
>
> We did not design and maintain effective controls over the accounting for net patient service operating revenues, net accounts receivable and amounts due to payors. Specifically, we did not design and maintain effective controls over (i) certain accounting estimates, including the completeness, accuracy and valuation of changes in estimates related to the recognition of net patient service operating revenues and specific transaction-related estimates of insurance plan repayments and (ii) the timely reconciliation of net accounts receivable balances and amounts due to payors with subsequent cash receipts, including controls over completeness and accuracy of such reconciliations, which led to inaccuracies in net patient service operating revenues, including contractual

allowances, allowances for uncollectible accounts and amounts due to payors.

- *Accounting for Income Taxes*

We did not design and maintain effective controls over the accounting for income taxes. Specifically, we did not design and maintain effective review controls over the completeness, existence, accuracy and presentation of our accounting for current and deferred income taxes.

- *Noncontrolling Interests*

We did not maintain effective controls over the review of analyses and schedules used to determine the carrying value of non-controlling interests, including noncontrolling interests subject to put rights. Specifically, the review was not sufficiently precise to detect errors in the schedules used to determine the amounts recorded in the consolidated financial statements.

- *Journal Entries*

We did not maintain effective internal control over the review and approval of journal entries. Specifically, our internal controls over journal entries were not operating effectively to ensure that journal entries included appropriate underlying supporting documentation to ensure the validity, accuracy, and completeness of recorded amounts.

***Information and Communication***

We did not design and maintain effective controls over information and communication. Specifically, we did not have an adequate process for internally communicating information within the accounting department and between and among other groups, such as the groups responsible for revenue recognition, accounts receivable and income taxes, necessary to support the proper functioning of internal controls impacting these accounts. These material weaknesses led to misstatements in our accounting for revenue recognition, accounts receivable and income taxes.

***Monitoring***

We did not design and maintain effective monitoring controls over compliance with established accounting policies, procedures and controls related to:

- revenue recognition (including accounting for accounts receivables and related reserves and amounts due to payors);
- accounting for income taxes;
- recording of balances impacted by noncontrolling interests, including

noncontrolling interests subject to put rights; and

- review and approval of journal entries.

(2018 10-K at 121, 122).

41. As a result of the foregoing admissions, the Company issued a "Remediation Plan for Material Weaknesses in Internal Control over Financial Reporting and Status" in order to "address control deficiencies and any other identified areas of risk:"

> **Remediation Plan for Material Weaknesses in Internal Control over Financial Reporting and Status**
>
> Management and the Board understand the importance of strong internal controls and the integrity of our financial statements. Management is committed to the planning and implementation of remediation efforts to address control deficiencies and any other identified areas of risk. These remediation efforts, which are either implemented or in process, are intended to both address the identified material weaknesses and to enhance our overall internal control environment. To date, we have taken and continue to take the actions described below to remediate the identified material weaknesses. Our remediation efforts are ongoing. As we continue to evaluate and work to improve our internal controls over financial reporting, our management may determine to take additional measures to address control deficiencies or determine to modify the remediation efforts described in this section.
>
> ***Control Environment***
>
> The Audit Committee, Board of Directors and management are committed to establishing a culture of compliance and integrity and have begun a comprehensive review of key practices and procedures. To that end, our Board has directed management to ensure that a proper, consistent tone is communicated throughout the Company. In our effort to remediate our material weaknesses associated with our control environment, we have implemented, are implementing or intend to undertake the following:
>
> - Effective March 26, 2019, our former Chief Financial Officer resigned his position. The Board authorized the appointment of Mark Herbers as Interim Chief Financial Officer and Interim Chief Accounting Officer effective March 28, 2019.
>
> - To assist in the restatement activities and related matters, we augmented our personnel with qualified consulting services which will continue as long as necessary.

- Initiatives are in process to redesign our internal control over financial reporting to formalize enhanced communications around revenue recognition, accounts receivable and income taxes; and

- We expect to provide training to employees across our entire Company regarding the importance of integrity, accountability, communication and compliance with accounting policies and procedures.

***Control Activities***

- *Revenue, Accounts Receivable, and Amounts due to Payors*

  - We have implemented and continue to implement measures to strengthen internal controls, including: (i) commencing the evaluation and establishment of policies, procedures and analytical tools, including certain controls to ensure that revenues, accounts receivable, contractual allowances and amounts due to payors are appropriately valued, (ii) ensuring a complete and accurate reconciliation of accounts receivable and amounts due to payors with subsequent cash receipts, (iii) developing more comprehensive and thorough analyses over the establishment of contractual allowances and reserves for uncollectible accounts, (iv) developing procedures to analyze the accounts receivable sub-ledger for over- and under-payments, and (v) establishing comprehensive and clear processes and controls to improve the completeness, accuracy and timeliness of billing.

- *Accounting for Income Taxes*

  - We have implemented and continue to implement measures to strengthen internal controls, including developing comprehensive and clear policies, procedures and controls regarding the completeness, existence, accuracy and presentation of our accounting for income taxes including the income tax provision and related assets and liabilities.

- *Noncontrolling Interests*

  - We are in the process of strengthening our controls over the review of schedules used to determine the carrying value of noncontrolling interests, including noncontrolling interests subject to put rights. Specifically, we are in the process of developing controls which will ensure a more thorough review over the inputs used in the calculation of noncontrolling interests and the completeness and accuracy of schedules used to determine adjustments to the carrying value of noncontrolling interest balances and their related impact on the consolidated financial statements.

- *Journal Entries*

    - We have re-assessed and revised our processes to strengthen controls over the review and approval of journal entries. Specifically, we have reinforced existing policies and procedures regarding obtaining adequate supporting documentation in connection with the review and approval of journal entries in order to ensure the validity, accuracy, and completeness of recorded amounts.

***Information and Communication***

In our effort to remediate our material weaknesses, we are formalizing procedures to ensure appropriate internal communication within the accounting department and between and among other departments. Among other things, we are instituting a control in which the finance team, including the Chief Financial Officer, Controller and the revenue recognition group, meets monthly with other departments to discuss changes in the business in order to timely identify those changes with implications for financial reporting.

***Monitoring***

We are enhancing our activities associated with monitoring activities employed to ascertain whether the Company's components of internal control are present and functioning. We maintain an independent internal audit function that reports directly to the Audit Committee. We are enhancing our processes to ensure that internal audit activities are expanded to include monitoring of compliance with the remediated controls over revenue and accounts receivable, amounts due to payors, noncontrolling interests, accounting for income taxes and review and approval of journal entries described above. Management has begun to, and will continue to, further document and evaluate financial reporting and other business processes and key controls. All controls identified and established as part of this remediation plan will be subject to management and internal audit review.

We are committed to maintaining a strong internal control environment, and we believe the measures described above will strengthen our internal control over financial reporting and remediate the identified material weaknesses. We will also continue to review, optimize and enhance our financial reporting controls and procedures. As we continue to evaluate and work to improve our internal control over financial reporting, we may take additional measures to address control deficiencies or we may modify certain of the remediation measures described above. The material weaknesses described above will not be considered remediated until the applicable remediated controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

(2018 Form 10-K at 123, 124).

**The Individual Defendants Knew, Or Were Reckless in Not Knowing, About the Conditions that Led to the Restatement**

42. The Individual Defendants, who served as American Renal's top executives during the Class Period, were each heavily involved with the financial aspects of the Company, including those falsely reported metrics that were restated. Each of the Individual Defendants knew, or were reckless in not knowing that the Company's controls over financial reporting were ineffective and that the Company's reported financial results were falsely reported during the Class Period.

43. Confidential Witness No. 1 ("CW-1") is a former collection and reimbursement specialist for American Renal, who was employed with the Company from January 2017 to April 2019, based at the Company's Beverly, MA corporate headquarters. During CW-1's employment at American Renal, CW-1 first reported to the Director of Accounts Receivable and Admissions and Billing & Reimbursement Supervisor Ashley Turczak and Director of Patient Admissions and Reimbursement Amie Matteson. Subsequently, after the collections and reimbursement unit was reorganized, CW-1 reported to Manager of Patient Admissions and Reimbursement Kayla Bearce and Director of Accounts Receivable Suhai Sanders.

44. According to CW-1, Defendants Carlucci, Boucher, and Wilcox all received detailed monthly financial reports that included information relating to monthly collections, write-offs, outstanding balances, and money expected to come in, among other financial data related to collections department and other departments in the Company. According to CW-1, any discrepancies between amounts collected versus what was expected could be ascertained in these reports. CW-1 stated that Individual Defendants often provided the collections department with feedback on these reports, including concerning the performance of employees in that department. According to CW-1, the Individual Defendants executives micro-managed the Company and, given their receipt of these monthly reports and subsequent feedback they would give, were aware

of the state of the Company's cash collections vis-à-vis the amounts being billed out by the Company.

**Defendant Boucher's Resignation**

45. On March 26, 2019, Defendant Boucher resigned from the Company and entered into a Separation Agreement with American Renal in connection with his resignation. As part of that Separation Agreement, Boucher agreed to cooperate with and provide consulting services as reasonably requested by the Company following the effective date of his resignation. Moreover, Boucher would receive continuing payments at an annual rate of $200,000 for a six-month period following the effective date of his resignation, which amounted to 50% of his annual salary rate before his resignation. Boucher also agreed that all of his outstanding equity awards, which included his shares of unvested restricted stock and any vested or unvested stock options, would be forfeited to the Company without payment of consideration.

46. These Separation Agreement terms were materially less than Defendant Boucher would have been entitled to if he was terminated "without cause" or resigned for "good reason" under the terms negotiated under Boucher's employment agreement (as described in the Company's July 23, 2018 Form 8-K filed with the SEC). Indeed, Boucher's employment agreement provided that he would be entitled to receive 100% of his base salary, $400,000, over a 12-month period and a pro-rata bonus for the year of termination. Moreover, when the Company issued the Restatement on September 5, 2019, it listed Boucher's resignation among the efforts it implemented to remediate American Renal's material weaknesses.

**The American Renal Board Took Punitive Action Against Defendant Carlucci**

47. Under his employment agreement, Defendant Carlucci is eligible to receive an annual cash incentive award. This cash incentive award is to be based upon the Company's

achievement of an Adjusted EBITDA (earnings before interest, taxes, depreciation and amortization) target. During the Class Period, Defendant Carlucci had a target bonus potential, which was computed as a percentage of his base salary. In 2018 that target was 100% of his base salary, with a threshold bonus of 50% and a maximum bonus potential of 150%. With respect to his service to the Company in 2018, Defendant Carlucci was eventually paid the minimum bonus equal to 50% of his target bonus potential, which was based on the falsely reported adjusted EBITDA results (which amounted to 90% of the target adjusted EBITDA). As a result of the Restatement and the Company's revised determinations of Adjusted EBITDA for the effected years, the American Renal Board determined (with Defendant Carlucci's concurrence) that the repayment to the Company of excess proceeds previously paid to him during the prior fiscal periods that were subject to the Restatement was appropriate. As a result, Defendant Carlucci repaid $880,223 to the Company. Additionally, in light of the Restatement, the American Renal Board considered it appropriate (and Defendant Carlucci concurred) that Defendant Carlucci would voluntarily forego any contractual entitlements to non-equity based incentive compensation and equity awards with respect to 2019.

## PROVISIONS GOVERNING AMERICAN RENAL'S FINANCIAL REPORTING

48. GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB"). These standards have been adopted by the SEC, which requires the financial statements of filers to adhere to such. The FASB has codified GAAP

into a structure called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers.

49. The SEC requires that public companies present financial statements in accordance with GAAP (17 C.F.R. § 210.4-01(a)(1)). SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "…will be presumed to be misleading or inaccurate, despite footnote of other disclosures...." (17 C.F.R. § 210.4-01(a)(1)). Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). Violations of GAAP, therefore, equate to violations of SEC Regulations (for publicly-traded companies).

50. The conceptual framework underlying financial accounting and reporting, especially the rules that comprise the accrual-based accounting required by the standards adopted by the SEC (i.e., GAAP), are set forth, among other places, in Statements of Financial Accounting Concepts ("FASCONs") promulgated by the Financial Accounting Standards Board.

51. FASCON No. 8, *Conceptual Framework for Financial Reporting - Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information* ("FASCON 8"), specifically, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." (FASCON 8, OB2).

52. This framework also states that "[i]nvestors', lenders' and other creditors' expectations about returns depend on their assessment of the amount, timing and uncertainty of

(the prospects for) future net cash inflows to the entity," and that, "[c]onsequently, existing and potential investors, lenders and other creditors need information to help them assess the prospects for future net cash inflows to an entity." (FASCON 8, OB3).

53. FASCON 8 also offers that, in order to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders and other creditors need information about the resources of the entity, claims against the entity." (FASCON OB4). It also states that investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources." (FASCON 8, OB4). Further, it provides that "[m]any existing and potential investors, lenders and other creditors cannot require reporting entities to provide information directly to them and must rely on general purpose financial reports for much of the financial information they need. Consequently, they are the primary users to whom general purpose financial reports are directed." (FASCON 8, OB5).

54. FASCON 8 asserts that, for financial information to be useful, "it must be relevant and faithfully represent what it purports to represent. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." (FASCON 8, QC4). In that context, the framework states: "[r]elevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources." (FASCON 8, QC6).

55. It also states:

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction

> would have three characteristics. It would be complete, neutral, and free from error.

(FASCON 8, QC12).

56. A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. In certain instances, "a complete depiction also may entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction." (FASCON 8, QC12).

57. During the Class Period, the Company's financial statements did not comply with the concepts established by the FASB, discussed above, and specifically did not faithfully represent the transactions it purported to represent. Accordingly, the Company failed to provide reliable and accurate financial information to its investors, lenders, creditors and other market participants. Further, the Company failed to provide reliable and accurate financial information to its investors, lenders, creditors and other market participants based on its specific violation of the accounting principles discussed below.

58. As described in ASC 250, *Accounting Changes and Error Corrections*, an error in the recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared requires an adjustment or revision to previously issued financial statements. That is, the previously issued financial statements have to be "restated". (ASC 250-10-05, -20) As alleged herein, American Renal has restated previously issued financial statements due to mistakes in the application of GAAP and the oversight and/or misuse of facts that existed at the time the original financial statements were prepared thereby causing errors in the recognition, measurement, presentation, or disclosure in those financial

statements.

**Revenue and Allowances**

59. GAAP provides rules for when and how to recognize revenue. GAAP has stated that in order for revenue to be recognized, it must be "realized or realizable" and "earned." (FASB Accounting Standards Codification section ("ASC") 605, *Revenue Recognition* ("ASC 605"), -10-25-1).[2]

60. ASC 605 states, in relevant part, referencing FASCON 5, *Recognition and Measurement in Financial Statements of Business Enterprises* ("FASCON 5"), that "[R]evenue and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash." (ASC 605-10-25-1). Prior to ASC 606 (discussed below), revenue generally was deemed to be realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,
- Delivery has occurred or services have been rendered,
- The seller's price to the buyer is fixed or determinable, and
- Collectibility is reasonably assured.

(Staff Accounting Bulletin "SAB" Topic 13: Revenue Recognition)

With respect to the price to the buyer being "fixed or determinable," the FASB ASC Master Glossary defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment." Therefore, prior to ASC 606, revenue could not be recorded until a specific set fee was known.

61. The FASB and the International Accounting Standards Board initiated an effort to improve financial reporting by creating common revenue recognition guidance for U.S. GAAP

[2] ASC 605 applies to periods during the Class Period that began prior to December 15, 2017. For periods beginning after December 15, 2017, refer to ASC 606.

and International Financial Report Standards (IFRS). As a result of this effort, the FASB created ASC 606, *Revenue from Contracts with Customers* ("ASC 606"). ASC 606 supersedes the revenue recognition requirements in ASC 605.

62. The core principle of ASC 606 is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. (ASC 606-10-10-2). An entity shall account for a contract with a customer that is within the scope of ASC 606 when all of the following criteria are met:

> a. The parties to the contract have approved the contract…and are committed to perform their respective obligations.
>
> b. The entity can identify each party's rights regarding the goods or services to be transferred.
>
> c. The entity can identify the payment terms for the goods or services to be transferred.
>
> d. The contract has commercial substance (that is, the risk, timing, or amount of the entity's future cash flows is expected to change as a result of the contract).
>
> e. It is probable that the entity will collect the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer...
>
> (ASC 606-10-25-1).

63. In determining the transaction price, an entity considers the terms of the contract and its customary business practices. ASC 606 specifically states:

> The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, excluding amounts collected on behalf of third parties… The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both.

(ASC-606-10-32-2)

64. The nature, timing, and amount of consideration promised by a customer affect the

estimate of the transaction price. When determining the transaction price, an entity considers the effects of all of the following:

a. Variable consideration

b. Constraining estimates of variable consideration

c. The existence of a significant financing component in the contract

d. Noncash consideration

e. Consideration payable to a customer

(ASC 606-10-32-3)

65. The amount of consideration to which the entity will be entitled may be less than the price stated in the contract if the consideration is variable. ASC 606 provides that "[the] amount of consideration can vary because of discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, or other similar items." (ASC 606-10-32-6) The variability relating to the consideration may be stated in the contract. In addition to any explicit terms in the contract, the promised consideration is variable if either of the following circumstances exists:

a. The customer has a valid expectation arising from an entity's customary business practices, published policies, or specific statements that the entity will accept an amount of consideration that is less than the price stated in the contract. That is, it is expected that the entity will offer a price concession. Depending on the jurisdiction, industry, or customer this offer may be referred to as a discount, rebate, refund, or credit.

b. Other facts and circumstances indicate that the entity's intention, when entering into the contract with the customer, is to offer a price concession to the customer.

(ASC 606-10-32-7)

66. An entity should estimate an amount of variable consideration by using either of the following methods, depending on which method the entity expects to better predict the amount

of consideration to which it will be entitled:

> a. The expected value—The expected value is the sum of probability-weighted amounts in a range of possible consideration amounts…
>
> b. The most likely amount—The most likely amount is the single most likely amount in a range of possible consideration amounts (that is, the single most likely outcome of the contract)…
>
> (ASC-606-10-32-8)

67. ASC 606 further states with respect to estimating variable consideration:

> An entity shall apply one method consistently throughout the contract when estimating the effect of an uncertainty on an amount of variable consideration to which the entity will be entitled. In addition, an entity **shall consider all the information (historical, current, and forecast) that is reasonably available to the entity and shall identify a reasonable number of possible consideration amounts.** The information that an entity uses to estimate the amount of variable consideration typically would be similar to the information that the entity's management uses during the bid-and-proposal process and in establishing prices for promised goods or services.
>
> (ASC 606-10-32-9)(Emphasis added.)

68. An entity includes in the transaction price variable consideration only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved. (ASC 606-10-32-11)

69. ASC 606 further discusses the assessment of significant reversals:

> In assessing whether it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur once the uncertainty related to the variable consideration is subsequently resolved, an entity shall consider both the likelihood and the magnitude of the revenue reversal. Factors that could increase the likelihood or the magnitude of a revenue reversal include, but are not limited to, any of the following:
>
> a. The amount of consideration is highly susceptible to factors outside the entity's influence. Those factors may include volatility in a market, the judgment or actions of third parties, weather conditions, and a high risk of obsolescence of the promised good or service.

b. The uncertainty about the amount of consideration is not expected to be resolved for a long period of time.

c. The entity's experience (or other evidence) with similar types of contracts is limited, or that experience (or other evidence) has limited predictive value.

d. The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e. The contract has a large number and broad range of possible consideration amounts.

(ASC 606-10-32-12)

70. At the end of each reporting period, an entity should update the estimated transaction price to represent faithfully the circumstances present at the end of the reporting period and the changes in circumstances that may have occurred during the reporting period. (ASC 606-10-32-14)

71. As noted above, when determining transaction price, an entity also considers consideration payable to a customer. Consideration payable to a customer includes cash amounts that an entity pays, or expects to pay, to the customer. This also includes credit or other items that can be applied against amounts owed to the entity. An entity shall account for consideration payable to a customer as a reduction of the transaction price and, therefore, of revenue unless the payment to the customer is in exchange for a distinct good or service that the customer transfers to the entity. (ASC 606-10-32-25)

72. ASC 450, *Contingencies* ("ASC 450"), provides guidance when credit losses relating to accounts receivable are expected to occur. ASC 450 establishes that an estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:

a. Information available before the financial statements are issued or are

available to be issued indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and

b. The amount of loss can be reasonably estimated.

(ASC 450-20-25-2).

73. An entity shall derecognize each distinct asset when it transfers control of the asset. (ASC 610-20-25-6). ASC 610, *Other Income—Gains and Losses from the Derecognition of Nonfinancial Assets,* states that "When an entity meets the criteria to derecognize a distinct nonfinancial asset or a distinct in substance nonfinancial asset, it shall recognize a gain or loss for the difference between the amount of consideration measured and allocated to that distinct asset and the carrying amount of the distinct asset." (ASC 610-20-32-2).

74. Goodwill is an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized. When a business is disposed of, goodwill associated with that business shall be included in the carrying amount of the business in determining the gain or loss on disposal. (ASC 350-20-40-9)

75. During the Class Period, American Renal failed to comply with the specific GAAP, discussed above, by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors. These errors in accounting resulted from American Renal's failure to design and maintain effective controls over the accounting for patient service operating revenues, net accounts receivable and amounts due to payors. As noted, American Renal, "did not design and maintain effective controls over (i) certain accounting estimates, including the completeness, accuracy and valuation of changes in estimates related to the recognition of net patient service operating revenues and specific transaction –related estimates of insurance plan repayments and (ii) the timely

reconciliation of net accounts receivable balances and amounts due to payors with subsequent cash receipts, including controls over completeness and accuracy of such reconciliations." (2018 Form 10-K, at 6, 7)

**Discussion of Management's Report on Internal Control Over Financial Reporting**

76. The Securities and Exchange Act of 1934 specifically states that an entity's management bears the obligation of establishing, implementing, and maintaining the system of internal control over financial reporting ("ICFR"), such that the company's books and records conform to the selected basis of accounting. (See, e.g. 13(b)(2) of the Securities and Exchange Act of 1934).

77. In 2002, Congress passed the Sarbanes-Oxley Act ("SOX"), which, among other things, established provisions related to ICFR. An overall purpose of ICFR is "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" (Securities Exchange Act of 1934, 17 C.F.R. § 240.13a-13(f) (2007)).

78. Section 404 of SOX requires publicly-traded companies annually to provide a report on internal controls prepared by their management and attested to by their independent auditors. Additionally, SOX requires management to: (1) acknowledge its responsibility for the adequacy of the company's internal control structure and procedures for financial reporting; and (2) assess the effectiveness of this ICFR.

79. The annual internal control report must contain:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;
- Management's assessment of the effectiveness of the company's internal control

over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective;

- A statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting; and
- A statement that the public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting.

80. SOX also requires that management evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. Material changes are required to be disclosed.

81. Management is not permitted to conclude that the company's internal control over financial reporting is effective if any material weaknesses are identified, and management must disclose any such material weaknesses.

82. American Renal has admitted that it had material weaknesses in its internal controls over financial reporting with respect to its control environment, control activities, information and communication and monitoring and as a result, the Company's financial statements filed during the Class Period were not prepared in accordance with GAAP. In this regard, as alleged below, the Company falsely stated, during the Class Period, that its internal control over financial reporting was effective.

83. American Renal's senior executives were required to file Section 302 certifications

pursuant to SOX, attesting that the financial information contained in the Company's SEC filings were true, did not omit material facts, that the Company's disclosure controls and procedures were effective; and, with respect to the Company's 2017 Form 10-K and 2018 first, second, and third quarter Forms 10-Q, that the Company's internal control over financial reporting provided reasonable assurance regarding the reliability of financial reporting and that the financial statements were prepared in accordance with GAAP. As alleged below, each of the Company's Class Period Form 10-Qs and Form 10-Ks included such Section 302 certifications by Defendant Carlucci and by either Defendant Wilcox or Boucher, and each of these certifications were false.

## DEFENDANTS' MATERIALLY FALSE STATEMENTS DURING THE CLASS PERIOD

### Second Quarter 2016 Financial Results

84. On August 9, 2016, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2016 (the "2Q2016 10-Q") which was signed by Defendant Wilcox. The 2Q2016 10-Q contained numerous materially false statements regarding American Renal's financial condition and second quarter 2016 financial results, all of which are detailed in the Company's 2018 Form 10-K (the "2018 10-K"), which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 2Q2016 10-Q, the Company reported net patient service operating revenues of $185.567 million, operating income of $33.733 million, net income of $13.396 million, a net loss attributable to American Renal of $9.092 million, adjusted EBITDA of $54.118 million, and reported accounts receivable of $76.904 million.[3]

[3] In the Company's 2018 Form 10-K, which contains the Restatement, the Company states that the originally reported amounts for operating income was $33.379 million, net income was $13.042 million, and net loss attributable to American Renal was $9.446 million. The revision amounts for these metrics in ¶87 below are based upon these numbers.

85. On that same day, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the 2Q2016 10-Q.

86. The next day, on August 10, 2016, the Company held an earnings call with analysts concerning American Renal's second quarter 2016 results, with Defendants Carlucci and Wilcox participating. Defendant Wilcox provided an in-depth view of the Company's quarterly results. Among other results, Defendant Wilcox stated that the Company "reported a GAAP net loss, attributable to American Renal Associates Holdings, Inc., of $9.1 million in the second quarter of 2016, as compared to positive net income of $5 million in the second quarter of 2015."

87. The statements in ¶¶84-86 above were materially false because the reported financial statements were restated by the Company. As restated, the Company upwardly revised net patient service revenues by $10.589 million to a restated $196.156 million. Operating income was upwardly revised by $10.492 million to a restated $43.871 million. Net income was upwardly revised by $8.127 million to a restated $21.169 million. Net loss attributable to American Renal was downwardly revised by $2.373 to a restated $7.073 million. Adjusted EBITDA was upwardly revised by $10.626 million to $64.744 million. Finally, Accounts receivable was upwardly revised by $54.081 million to a restated $130.985 million.

88. The second quarter 2016 Form 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. §

210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

89. The 2Q2016 10-Q contained the following statement regarding the evaluation of the Company's controls and procedures:

> Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial Officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 30, 2016. In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applied its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of June 30, 2016.

90. The 2Q2016 10-Q reported that "[t]here have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) during the quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

91. The statements in ¶¶89-90 above were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

92. Furthermore, the 2Q2016 10-Q contained Section 302 Certifications pursuant to the

Sarbanes Oxley Act of 2002 signed by Defendants Carlucci and Wilcox, which stated the following:

> 1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 of American Renal Associates Holdings, Inc. (the "registrant");
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)) and 15d-15(e)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

93. The statements in ¶92 above concerning the Company's controls, including Defendants Carlucci and Wilcox's Section 302 Certifications, were materially false because:

a. The respective quarterly and annual SEC filings *did* contain untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the relevant periods;

b. The financial statements, and other financial information, did *not* fairly present in all material respects the financial condition, results of operations and cash flows of American Renal, with respect to the relevant periods;

c. The certifying officers referenced in the respective quarterly and annual SEC filings *did not* design, or cause to be designed, disclosure controls and procedures to ensure that material information relating to American Renal and its consolidated subsidiaries was made known to such officers with respect to the relevant periods;

d. The certifying officers referenced in the respective quarterly and annual SEC filings *did not* properly evaluate the effectiveness of American Renal's disclosure controls and procedures, and thus *did not* present in the respective SEC filings, accurate conclusions about the effectiveness of the disclosure controls and procedures, as of the end of each relevant period;

e. The certifying officers *did not* disclose in the respective SEC filings all changes in American Renal's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that materially affected, or were reasonably

likely to materially affect, the Company's internal control over financial reporting; and

f. The certifying officers *did not* disclose all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which were reasonably likely to adversely affect American Renal's ability to record, process, summarize and report financial information.

**Third Quarter 2016 Financial Results**

94. On November 10, 2016, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2016 (the "3Q2016 10-Q") which was signed by Defendant Wilcox. The 3Q2016 10-Q contained numerous materially false statements regarding American Renal's financial condition and third quarter 2016 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in this 3Q2016 10-Q, the Company reported net patient service operating revenues of $192.955 million, operating income of $30.752 million, net income of $30.046 million, net income attributable to American Renal of $12.424 million, adjusted EBITDA of $56.154 million, and accounts receivable of $77.253 million.

95. On that same day, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the 3Q2016 10-Q.

96. The next day, on November 11, 2016, the Company held an earnings call with analysts concerning American Renal's third quarter 2016 results, with Defendants Carlucci and Wilcox participating. Defendant Wilcox specifically discussed the Company's operational and financial highlights of the third quarter 2016. Among other results, Defendant Wilcox stated that

the Company "reported GAAP net income attributable to American Renal Associates Holdings, Inc. of $12.4 million in the third quarter of 2016 as compared to $4.1 million in the third quarter of 2015."

97. The statements in ¶¶94-96 above were materially false because the reported financial statements were restated by the Company. As restated, the Company downwardly revised net patient service revenues by $816,000 to $192.139 million. Operating income was downwardly revised by $811,000 to $29.941 million. Net income was upwardly revised by $71,000 to $36.117 million. Net income attributable to American Renal was upwardly revised by $348,000 to $12.772 million. Adjusted EBITDA was downwardly revised by $784,000 to $55.370 million. Accounts receivable was upwardly revised by $53.265 million to $130.518 million.

98. The 3Q2016 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

99. American Renal's 3Q2016 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure

controls and procedures as in the second quarter 2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

100. The statements in ¶99 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

101. The 3Q2016 10-Q also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2Q2016 10-Q (*see* ¶92 above). These statements were materially false for the same reasons as alleged in ¶93 above.

**<u>Fourth Quarter and Full Year 2016 Financial Results</u>**

102. On March 8, 2017, the Company filed with the SEC its 2016 Form 10-K (the "2016 10-K"), which was signed by Defendants Carlucci, Wilcox and Boucher, among others. The 2016 10-K reported the Company's financial results for both the fourth quarter of 2016 and the full-year 2016, ended December 31, 2016. The 2016 10-K contained numerous materially false statements regarding American Renal's financial condition and fourth quarter and full year 2016 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this

Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 2016 Form 10-K, for the fourth quarter of 2016 net income of $16.560 million and adjusted EBITDA of $55.88 million. For the full year 2016, the Company reported net patient service operating revenues of $749.767 million, operating income of $126.807 million, net income of $88.205 million, a net loss attributable to American Renal of $385,000, and adjusted EBITDA of $212.172 million. The Company also reported accounts receivable of $81.127 million as of December 31, 2016.

103. The day before the filing of the 2016 10-K with the SEC, on March 7, 2017, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the Form 10-K.

104. On March 8, 2017, the Company held an earnings call with analysts concerning American Renal's fourth quarter and full year 2016 results, with Defendants Carlucci and Wilcox participating, among others. Defendant Wilcox specifically covered the Company's operational and financial highlights from the quarter and full year. Among other results, Defendant Wilcox stated that the Company "reported GAAP net loss attributable to American Renal Associates Holdings, Inc. of $7.1 million in the fourth quarter of 2016 as compared to net income of $6.8 million in the fourth quarter of 2015."

105. The statements in ¶¶102-104 above were materially false because the reported financial statements were restated by the Company. As restated for the fourth quarter 2016, net income was downwardly revised by $4.17 million to $12.390 million and adjusted EBITDA was downwardly revised by $4.146 million to $51.734 million. For the full year 2016, net patient service operating revenues were upwardly revised by $17.013 million to $766.780 million. Operating income was upwardly revised by $16.719 million to $143.526 million. Net income

was upwardly revised by $13.461 million to $101.666 million. A net loss attributable to American Renal was decreased by $3.531 million to a net income of $3.146 million. Adjusted EBITDA was upwardly revised by $17.004 million to $229.176 million. Accounts receivable as of December 31, 2016 was upwardly adjusted by $49.084 million to $130.211 million.

106. The 2016 Form 10-K represented that the consolidated financial statements contained therein were prepared in accordance with GAAP. This statement was materially false because, as the Company admitted in its 2018 Form 10-K, its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

107. American Renal's 2016 10-K made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the 2Q2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

108. The statements in ¶107 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company

did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

109. The 10-K also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2Q 2016 10-Q (*see* ¶92 above). These statements were materially false for the same reasons as alleged in ¶93 above.

**First Quarter 2017 Financial Results**

110. On May 9, 2017, the Company filed with the SEC its Form 10-Q for the quarterly period ended March 31, 2017 (the "1Q2017 10-Q"), which was signed by Defendant Wilcox. The 1Q2017 10-Q contained numerous materially false statements regarding American Renal's financial condition and first quarter 2017 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 1Q2017 10-Q, the Company reported net patient service operating revenues of $177.025 million, operating income of $12.470 million, net income of $12.902 million, a net loss attributable to American Renal of $1.251 million, adjusted EBITDA of $35.568 million, and accounts receivable in the amount of $77.495 million.

111. On that same day, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the 1Q2017 10-Q.

112. The next day, on May 10, 2017, the Company held an earnings call with analysts concerning American Renal's first quarter 2017 results, with Defendants Carlucci and Wilcox participating, among others. Defendant Wilcox specifically covered the Company's operational and financial highlights for the first quarter and discussed the Company's outlook for 2017

adjusted EBITDA-NCI (non-controlling interests). Among other results, Defendant Wilcox stated that the Company "reported a GAAP net loss attributable to American Renal Associates Holdings, Inc. of $1.25 million for the first quarter of 2017 as compared to net income of $3.8 million in the first quarter of 2016."

113. The statements in ¶¶110-112 above were materially false because the reported financial statements were restated by the Company. As restated, the Company downwardly revised its net patient service operating revenues for the first quarter of 2017 by $731,000 to a restated $176.294 million. Operating income was downwardly revised by $796,000 to a restated $11.674 million. Net income was downwardly revised by $1.14 million to a restated $11.762 million. Net loss attributable to American Renal was upwardly revised by $871,000 to a restated $2.122 million. Adjusted EBITDA was downwardly revised by $730,000 to $34.838 million. Finally, accounts receivable was upwardly revised by $48.354 million to a restated $125.849 million.

114. The 1Q2017 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible

accounts and amounts due to payors.

115. American Renal's 1Q2017 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the 2Q2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

116. The statements in ¶115 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

117. The 1Q2017 10-Q also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2Q 2016 10-Q (*see* ¶92 above). These statements were materially false for the same reasons as alleged in ¶93 above.

**<u>Second Quarter 2017 Financial Results</u>**

118. On August 8, 2017, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2017 (the "2Q2017 10-Q"), which was signed by Defendant Wilcox. The 2Q2017 10-Q contained numerous materially false statements regarding American Renal's

financial condition and second quarter 2017 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 2Q2017 10-Q, the Company reported net patient revenues of $185.992 million, operating income of $27.156 million, net income of $16.391 million, a net loss attributable to American Renal of $2.106 million, adjusted EBITDA of $45.9 million, and accounts receivable of $77.841 million.

119. On that same day the second quarter 2017 10-Q was filed, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the 2Q2017 10-Q.

120. The next day, on August 9, 2017, the Company held an earnings call with analysts concerning American Renal's second quarter 2017 results, with Defendants Carlucci and Wilcox participating, among others. Defendant Wilcox specifically covered the details of the Company's second quarter financial performance and outlook. Among other results, Defendant Wilcox stated that the Company "reported a GAAP net loss attributable to American Renal Associates Holdings Inc. of $2.1 million in the second quarter of 2017 as compared to a net loss of $9.5 million in the second quarter of 2016."

121. The statements in ¶¶118-120 above were materially false because the reported financial statements were restated by the Company. As restated, the Company downwardly revised its net patient service operating revenues for the second quarter of 2017 by $8.533 million to a restated $177.459 million. Operating income was downwardly revised by $8.879 million to a restated $18.277 million. Net income was downwardly revised by $6.632 million to a restated $9.759 million. Net loss attributable to American Renal was upwardly revised by $2.967 million to a restated $5.073 million. Adjusted EBITDA was downwardly revised by $8.525 million to

$37.375 million. Finally, accounts receivable was upwardly revised by $13.382 million to a restated $104.890 million.

122. The 2Q2017 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

123. American Renal's 2Q2017 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the second quarter 2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

124. The statements in ¶123 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue

recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

125. The 2Q2017 10-Q also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2Q2016 10-Q (*see* ¶92 above). These statements were materially false for the same reasons as alleged in ¶93 above.

**Third Quarter 2017 Financial Results**

126. On November 14, 2017, the Company filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2017 (the "3Q2017 10-Q"), which was signed by Defendant Wilcox. The 3Q2017 10-Q contained numerous materially false statements regarding American Renal's financial condition and third quarter 2017 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 3Q2017 10-Q, the Company reported net patient revenues of $187.711 million, operating income of $32.901 million, net income of $26.672 million, net income attributable to American Renal of $7.983 million, adjusted EBITDA $46.838 million, and accounts receivable in the amount of $81.234 million.

127. On that same day the 3Q2017 10-Q was filed, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the Form 10-Q.

128. The next day, on November 15, 2017, the Company held an earnings call with analysts concerning American Renal's third quarter 2017 results, with Defendants Carlucci and

Wilcox participating, among others. Defendant Wilcox specifically covered details of the Company's third quarter financial performance and 2017 outlook. Among other results, Defendant Wilcox stated that the Company "reported a GAAP net income attributable to American Renal Associates Holdings, Inc. of $8 million in the third quarter of 2017 as compared to $10.7 million in the third quarter of 2016.

129. The statements in ¶¶126-128 above were materially false because the reported financial statements were restated by the Company. As restated, the Company upwardly revised its net patient service operating revenues for the third quarter of 2017 by $207,000 to a restated $187.918 million. Operating income was upwardly revised by $323,000 to a restated $33.224 million. Net income was downwardly revised by $881,000 to a restated $25.791 million. Net income attributable to American Renal was downwardly revised by $487,000 to a restated $7.496 million. Adjusted EBITDA was upwardly revised by $101,000 to $46.939 million. Finally, accounts receivable was upwardly revised by $40.026 million to a restated $121.260 million.

130. The 3Q2017 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible

accounts and amounts due to payors.

131. American Renal's 3Q2017 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the second quarter 2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

132. The statements in ¶131 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

133. The 3Q2017 10-Q also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2Q2016 10-Q (*see* ¶92 above). These statements were materially false for the same reasons as alleged in ¶93 above.

**<u>Fourth Quarter and Full Year 2017 Financial Results</u>**

134. On March 6, 2018, the Company filed with the SEC its 2017 Form 10-K (the "2017 10-K"), which was signed by Defendants Carlucci, Wilcox and Boucher, among others. The 2017 10-K reported the Company's financial results for both the fourth quarter of 2017 and the full-year

2017, ended December 31, 2017. The 2017 10-K contained numerous materially false statements regarding American Renal's financial condition and fourth quarter and full year 2017 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 2017 10-K, for the fourth quarter of 2017, the Company reported net patient service operating revenues of $194.378 million, operating income of $33.931 million, net income of $19.718 million, net income attributable to American Renal of $231,000, and adjusted EBITDA of $48.051 million. For the full year 2017, the Company reported net patient service operating revenues of $745.106 million, operating income of $106.458 million, net income of $75.683 million, net income attributable to American Renal of $4.857 million, and adjusted EBITDA of $176.357 million. The Company also reported accounts receivable as of December 31, 2017 of $79.662 million.

135. On that same day the 2017 10-K was filed, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the Form 10-K.

136. The next day, on March 7, 2019, the Company held an earnings call with analysts concerning American Renal's fourth quarter and full year 2017 results, with Defendants Carlucci and Wilcox participating, among others. Defendant Wilcox specifically covered details of the Company's fourth quarter and full year 2017 financial performance and 2018 outlook. Among other results, Defendant Wilcox stated that the Company "reported a GAAP net income attributable to American Renal Associates Holdings Inc. of $0.2 million in the fourth quarter of 2017 as compared to a loss of $7.1 million in the fourth quarter of 2016. For the full year of 2017, we reported GAAP net income attributable to ARAH of $4.9 million as compared to a loss of $0.4

million in 2016."

137. The statements in ¶¶134-136 above were materially false because the reported financial statements were restated by the Company. As restated for the fourth quarter 2017, the Company downwardly revised net patient service operating revenues by $7.047 million to $187.331 million. Operating income was downwardly revised by $6.898 million to $27.033 million. Net income was downwardly revised by $8.894 million to $10.824 million. Net income attributable to American Renal was downwardly revised by $5.129 million to a net loss attributable to American Renal of $4.898 million. Adjusted EBITDA was downwardly revised by $6.344 million to $41.707 million. For the full year 2017, net patient service operating revenues were downwardly revised by $16.104 million to $729.002 million. Operating income was downwardly revised by $16.25 million to $90.208 million. Net income was downwardly revised by $17.547 million to $58.136 million. Net income attributable to American Renal was downwardly revised by $9.454 million to a net loss of $4.597 million. Adjusted EBITDA was downwardly revised by $15.498 million to $160.859 million. Accounts receivable as of December 31, 2017 was upwardly revised by $32.98 million to $112.642 million.

138. The 2017 10-K represented that the consolidated financial statements contained therein were prepared in accordance with GAAP. This statement was materially false because, as the Company admitted in its 2018 Form 10-K, its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

139. American Renal's 2017 10-K made substantially similar (if not identical)

statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the 2Q2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

140. Additionally, the 2017 10-K contained Management's Annual Report on Internal Control over Financial Reporting, which stated, in relevant part, that "[o]ur management, with the participation of our Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of our internal control over financial reporting as of December 31, 2017. In making this assessment, our management used the criteria set forth in the *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2017."

141. The statements in ¶¶139-140 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

142. The 10-K also contained similar Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2Q2016 10-Q (*see* ¶92 above) with the exception that

it included additional language that Defendants Carlucci and Wilcox "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." These statements were materially false for the same reasons as alleged in ¶93 above. Additionally, these statements were materially false because the certifying officers referenced in the respective quarterly and annual SEC filings *did not* design, or cause to be designed, internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, with respect to the relevant periods

**First Quarter 2018 Financial Results**

143. On May 8, 2018, the Company filed with the SEC its Form 10-Q for the quarterly period ended March 31, 2018 (the "1Q2018 10-Q"), which was signed by Defendant Wilcox. The 1Q2018 10-Q contained numerous materially false statements regarding American Renal's financial condition and first quarter 2018 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 1Q2018 10-Q, the Company reported patient service operating revenues of $194.672 million, operating income of $21.399 million, net income of $13.713 million, a net loss attributable to American Renal of $910,000, adjusted EBITDA of $37.361 million, and accounts receivable of $85.723 million.

144. On that same day the 1Q2018 10-Q was filed, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the 1Q2018 10-Q.

145. The next day, on May 9, 2018, the Company held an earnings call with analysts concerning American Renal's first quarter 2018 results, with Defendants Carlucci and Wilcox participating, among others. Defendant Wilcox specifically covered details of the Company's first quarter 2018 financial performance. Among other results, Defendant Wilcox stated that the Company "reported a GAAP net loss attributable to American Renal Associates Holdings, Inc. of $0.9 million in the first quarter of 2018 as compared to a loss of $1.3 million in the first quarter of 2017."

146. The statements in ¶¶143-145 above were materially false because the reported financial statements were restated by the Company. As restated, the Company downwardly revised patient service operating revenues by $8.373 million to $186.299 million. Operating income was downwardly revised $8.826 million to $12.573 million. Net income was downwardly revised by $6.549 million to $7.164 million. The reported net loss attributable to American Renal was upwardly revised by $2.892 million to a net loss of $3.802 million. Adjusted EBITDA was downwardly revised by $9.087 million to $28.274 million. Accounts receivable was upwardly revised by $24.608 million to $110.331 million.

147. The 1Q2018 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in

¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

148. American Renal's 1Q2018 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the 2Q2016 10-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

149. The statements in ¶148 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

150. The 1Q2018 10-Q also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2017 10-K (*see* ¶142 above). These statements were materially false for the same reasons as alleged in ¶¶93, 142 above.

**Second Quarter 2018 Financial Results**

151. On August 7, 2018, the Company filed with the SEC its Form 10-Q for the quarterly

period ended June 30, 2018 (the "2Q 2018 10-Q"), which was signed by Defendant Wilcox. The 2Q 2018 10-Q contained numerous materially false statements regarding American Renal's financial condition and second quarter 2018 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in the 2Q 2018 10-Q, the Company reported patient service operating revenues of $217.178 million, operating income of $7.453 million, net income of $2.277 million, a net loss attributable to American Renal of $18.008 million, adjusted EBITDA of $51.793 million, and accounts receivable of $91.508 million.

152. On that same day the 2Q 2018 10-Q was filed, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Wilcox, repeating the same results reported in the 2Q 2018 10-Q.

153. The next day, on August 8, 2018, the Company held an earnings call with analysts concerning American Renal's second quarter 2018 results, with Defendants Carlucci, Boucher, and Wilcox participating, among others. Defendant Wilcox specifically covered details of the Company's second quarter 2018 financial performance. Among other results, Defendant Wilcox stated that the Company "reported a GAAP net loss attributable to American Renal Associates Holdings, Inc. of $18 million in the second quarter of 2018 as compared to a loss of $2.1 million in the second quarter of 2017."

154. The statements in ¶¶151-153 above were materially false because the reported financial statements were restated by the Company. As restated, the Company downwardly revised patient service operating revenues by $11.226 million to $205.952 million. Operating income was downwardly revised by $11.763 million to negative $4.310 million. Net income was downwardly revised by $10.660 million to a net loss of $8.383 million. The net loss attributable

to American Renal Holdings upwardly revised by $5.651 million to a net loss of $23.659 million. Adjusted EBITDA was downwardly revised by $11.763 million to $40.03 million. Accounts receivable was upwardly revised by $13.382 million to $104.890 million.

155. The 2Q 2018 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

156. American Renal's 2Q 2018 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the second quarter 201610-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

157. The statements in ¶156 above concerning the Company's controls were materially false because, as discussed in more detail in ¶37-40 above, the Company later admitted the

Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

158. The 2Q 2018 10-Q also contained substantially similar (if not identical) Section 302 certifications by Defendants Carlucci and Wilcox as contained in the Company's 2017 10-K (*see* ¶142 above). These statements were materially false for the same reasons as alleged in ¶¶93, 142 above.

159. On November 9, 2018, the Company filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q2018 10-Q"), which was signed by Defendant Boucher. In that Form 10-Q, American Renal disclosed that during the previous month the staff of the SEC "requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collections and related matters." On this news, share price of American Renal fell $0.74 (over 4%) to close at $10.46 on the next trading day, November 12, 2018, on higher than usual trading volume.

160. Notwithstanding the SEC inquiry, the 3Q2018 10-Q contained numerous materially false statements regarding American Renal's financial condition and third quarter 2018 financial results, all of which are detailed in the Company's 2018 Form 10-K, which is attached to this Complaint as Exhibit A and incorporated by reference herein. Among those financial results in 3Q2018 10-Q, the Company reported patient service operating revenues of $211.019 million, operating income of $30.049 million, net income of $18.294 million, net income attributable to American Renal of $2.490 million, adjusted EBITDA of $42.435 million and accounts receivable

of $90.596 million.

161. On November 8, 2019, the day before the 3Q2018 10-Q was filed, the Company issued a press release, which was also filed with the SEC attached to a Form 8-K signed by Defendant Boucher, repeating the same results reported in the 3Q2018 10-Q.

162. Also on that same day, November 9, 2018, the Company held an earnings call with analysts concerning American Renal's third quarter 2018 results, with Defendants Carlucci and Boucher participating, among others. Defendant Boucher specifically covered details of the Company's second quarter 2018 financial performance. Among other results, Defendant Boucher stated that the Company "reported GAAP net income attributed to American Renal Associates Holding, Inc. of $2.5 million in the third quarter of 2018 as compared to $8 million in the third quarter of 2017."

163. The statements in ¶¶160-162 above were materially false because the reported financial statements were restated by the Company. As restated, the Company downwardly revised patient service operating revenues by $5.3 million to $205.719 million. Operating income was downwardly revised by $5.939 million to $24.110 million. Net income was downwardly revised by $5.782 million to $12.512 million. Net income attributable to American Renal was downwardly revised by $3.224 million to a net loss of $734,000. Adjusted EBITDA was downwardly revised by $5.939 million to $36.496 million. Accounts Receivable was upwardly revised by $8.082 million to $98.678 million.

164. The 3Q2018 10-Q represented that the unaudited consolidated financial statements contained therein were prepared pursuant to the rules and regulations of the SEC regarding interim financial reporting. This statement was materially false because, as alleged in ¶49 above, Regulation S-X requires that interim financial statements must also comply with GAAP, with the

exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)). The Company admitted in its 2018 Form 10-K that its consolidated financial statements for the periods subject to the Restatement were not prepared in accordance with GAAP. Moreover, as alleged in ¶¶48-75 above, American Renal failed to comply with the GAAP by failing to appropriately record net patient service operating revenues, contractual allowances, allowances for uncollectible accounts and amounts due to payors.

165. American Renal's 3Q2018 10-Q made substantially similar (if not identical) statements regarding management's evaluation of the effectiveness of the Company's disclosure controls and procedures as in the second quarter 201610-Q and their conclusion that those controls and procedures were operating effectively and that there had been no changes in the Company's internal controls over financial reporting during the quarter that materially affected or were reasonably likely to materially affect its internal control over financial reporting (*see* ¶¶89-90 above).

166. The statements in ¶165 above concerning the Company's controls were materially false because, as discussed in more detail in ¶¶37-40 above, the Company later admitted the Company did not maintain an effective control environment in connection with the revenue recognition process, the Company had material deficiencies in control activities, the Company did not design and maintain effective controls over information and communication, and the Company did not design and maintain effective controls over compliance with established accounting policies, procedures and controls.

167. The 3Q2018 10-Q also contained Section 302 certifications by Defendants Carlucci and Boucher with substantially similar (if not identical) language as contained in the Section 302

certifications in the Company's 2017 10-K (*see* ¶142 above). These statements were materially false for the same reasons as alleged in ¶¶93, 142 above.

168. On March 8, 2019 American Renal filed a Form NT 10- K with the SEC, announcing it would delay the filing of its earnings report for the fiscal year ended December 31, 2018 as it continued to examine reserve computations and other accounting practices that may have an impact on the company's accounts receivable and revenue for 2018, as well as previously reported fiscal years ranging from 2014 through 2017. On this news, shares of American Renal fell $2.05 per share or over 16% to close at $10.46 per share on March 8, 2019 on extremely high volume.

169. On March 27, 2019, the last day of the Class Period, American Renal announced that investors should no longer rely upon the Company's previously issued consolidated financial statements and other financial data for the fiscal years ended December 31, 2014, 2015, 2016 and 2017 contained in its Annual Reports on Form 10-K for the years ended December 31, 2016 and 2017, and its condensed consolidated financial statements for the quarters and year-to-date periods ended March 31, June 30, and September 30 in 2016, 2017 and 2018 in the Company's Forms 10-Q. American Renal also announced that investors should no longer rely upon the Company's previous assessment of internal control over financial reporting. The Company also announced that Defendant Boucher resigned as the Company's Vice President and Chief Financial Officer effective March 26, 2019. On this news, share price of American Renal fell $3.69 (or 38%) to close at $6.01 on March 28, 2019, on extremely high volume.

## **SUMMARY OF SCIENTER ALLEGATIONS**

170. Throughout the Class Period, Defendants knowingly or recklessly misled Lead Plaintiff and other investors with respect to American Renal's financial results and the state of the Company's controls over financial reporting. The materially false financial results concerned the

Company's main source of revenue, payments for services provided at its dialysis clinics; and, the misstated metrics had a cascading effect throughout the entirety of American Renal's reported financial results. Nevertheless, and despite the importance of these metrics, the Company has admitted, among other things, it did not design and maintain effective controls over the accounting for net patient service operating revenues, net accounts receivable and amounts due to payors. Moreover, the Company has admitted that it did not employ personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with the increasing size of the entity and nature and complexity of the Company's financial reporting requirements.

171. The magnitude of the Restatement supports a strong inference that Defendants acted with scienter when they made their materially false statements. For example, for fiscal year 2017, the Restatement reduced net income by over 23%. Net income attributable to American Renal was reduced by over 200%, resulting in a net loss.

172. Defendants' scienter is supported because the Individual Defendants – representing American Renal's top executive officers – were heavily involved in the financial oversight of the Company. As alleged above in ¶44, Defendants Carlucci, Boucher, and Wilcox all received detailed monthly financial reports which included relating to monthly collections, write-offs, outstanding balances, and money expected to come in, among other financial data related to collections department and other departments in the Company. Defendants not only had access to these reports, but also reviewed these reports – as evidenced by the fact that they often provided the collections department with feedback, including feedback concerning the performance of employees in that department. Defendants micro-managed the Company, and given their receipt of these monthly reports and subsequent feedback they would give, knew or were reckless in not

knowing of the state of the Company's cash collections vis-à-vis the amounts being billed out by the Company.

173. Defendants' scienter is further supported by the fact that they continued to state that the Company's controls and procedures were effective at reasonable assurance levels and execute Section 302 Certifications even after the staff of the SEC requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collection and related matters and before any substantive internal review. Given that that the SEC was specifically asking for documents surrounding these matters, Defendants knew or were reckless in not knowing, that the Company's accounting was erroneous such that they should not have filed the third quarter 2018 10-Q, as originally reported. Indeed, the Company was required to disclose the SEC inquiry to investors because it was material information beyond a request to examine American Renal's books and records in the ordinary course of SEC oversight.

174. Defendants' scienter is further supported by the fact that Defendant Boucher was forced to resign on March 26, 2019, the day before the Company announced that previously issued consolidated financial statements and other financial data should be restated and should no longer be relied upon, and that its management's previous assessment of internal control over financial reporting should no longer be relied upon. The Company later admitted that Boucher's resignation was related to the fraudulent conduct alleged herein, as it described the Boucher resignation as one of the measures the Company implemented in its effort to remediate the material weaknesses associated with its control environment.

175. Defendant Carlucci was motivated to commit fraud in that he was eligible to receive a cash incentive award, which was dependent on the Company's achievement of an Adjusted EBITDA target. As a result of the Restatement and the Company's revised determinations of

Adjusted EBITDA for the effected years, the American Renal Board determined (with Defendant Carlucci's concurrence) that the repayment of excess proceeds previously paid to him during the prior fiscal periods that were subject to the Restatement was appropriate. As a result, Defendant Carlucci repaid $880,223 to the Company. With respect to the events that led to the Restatement, Defendant Carlucci, the Company announced that he would also voluntarily forego any contractual entitlements to non-equity based incentive compensation and equity awards with respect to 2019. These punitive measures taken against Defendant Carlucci by the Company indicate that Defendant Carluccci was responsible for issuing the false financial statements and American Renal's failure to implement adequate internal control over financial reporting, thus further supporting a strong inference of scienter.

## LOSS CAUSATION

176. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial losses. During the Class Period, Plaintiff and the Class purchased American Renal common stock at artificially inflated prices and were damaged thereby when the price of American Renal common stock declined when the truth was revealed. The price of American Renal common stock significantly declined (causing investors to suffer losses) when Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

177. Throughout the Class Period, Defendants issued a series of false statements that mislead Plaintiff and other investors with respect to American Renal's financial results and the adequacy of its internal controls.

178. Defendants' false statements caused and maintained artificial inflation in the price

of American Renal's common stock throughout the Class Period until facts about the Company's true condition were revealed to the market. The timing and magnitude of American Renal's common stock price declines, as detailed herein, negate any inference that the losses suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct. The market for the Company's common stock promptly digested current information with respect to American Renal from all publicly available sources and reflected such information in the price of the Company's common stock.

179. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other members of the Class was a direct result of the relevant truth about Defendants' scheme being revealed to the market in a series of partial adverse disclosures. When Defendants' prior false statements were corrected and became apparent, and the risks concealed by them materialized, investors suffered losses as the price of American Renal common stock declined because the price inflation was removed. As a result of their purchases of American Renal common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

180. On November 9, 2018, the Company filed a Form 10-Q reporting its third quarter 2018 financial results with the SEC. In that Form 10-Q, American Renal disclosed that during the previous month the staff of the SEC "requested that the Company voluntarily provide documents and information relating to certain revenue recognition, collections and related matters." On this news, share price of American Renal fell $0.74 (over 4%) to close at $10.46 on the next trading day, November 12, 2018. Defendants, however, did not reveal the whole truth, as this filing contained materially false financial results of the Company and false certifications regarding the effectiveness of the Company's controls over financial reporting. Had the Company disclosed the

materially false nature of its previously-reported financial results and that it did not have effective controls over financial reporting, the Company's stock would have fallen more.

181. On March 8, 2019, the Company disclosed in a Form NT 10- K filed with the SEC that it would delay the filing of its earnings report for the fiscal year ended December 31, 2018 as it continues to examine reserve computations and other accounting practices that may have an impact on the company's accounts receivable and revenue for 2018, as well as previously reported fiscal years ranging from 2014 through 2017. On this news, shares of American Renal fell $2.05 per share or over 16% to close at $10.46 per share on March 8, 2019 on extremely high trading volume.

182. On March 27, 2019, after market hours, the Company announced that its previously issued consolidated financial statements and other financial data for the fiscal years ended December 31, 2014, 2015, 2016 and 2017 contained in its Annual Reports on Form 10-K for the years ended December 31, 2016 and 2017, and its condensed consolidated financial statements for the quarters and year-to-date periods ended March 31, June 30, and September 30 in 2016, 2017 and 2018 in the Company's Form 10-Qs should be restated and should no longer be relied upon. The Company announced that its management's previous assessment of internal control over financial reporting should no longer be relied upon. The Company also announced that Defendant Boucher resigned as the Company's Vice President and Chief Financial Officer effective March 26, 2019. On this news, on March 28, 2019, shares of American Renal fell $3.69 per share or 38% to close at $6.01 per share, on extremely high trading volume.

183. Accordingly, as a result of their purchases of American Renal's publicly traded common stock during the Class Period, Plaintiff and other members of the Class suffered significant economic loss and damages.

**PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

184. The market for American Renal's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements made by Defendants and alleged herein, American Renal's common stock traded at artificially inflated prices during the Class Period. On November 17, 2016, the Company's stock closed at a Class Period high of $24.93. Plaintiff and the other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of American Renal's common stock and market information relating to American Renal, and have been damaged thereby.

185. During the Class Period, the artificial inflation of American Renal's stock was caused by the material misrepresentations particularized in this Complaint, causing the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about American Renal's business, prospects, and operations. These material misstatements created an unrealistically positive assessment of American Renal and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when the truth was disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

186. At all relevant times, the market for American Renal's common stock was an efficient market for the following reasons, among others:

a. American Renal stock met the requirements for listing, and was listed, and

actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, American Renal filed periodic public reports with the SEC and/or the NYSE;

c. American Renal regularly communicated with public investors via established market communications mechanisms, including through regular dissemination of press releases on the national circuit of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. American Renal was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

187. As a result of the foregoing, the market for American Renal's common stock promptly digested current information regarding American Renal from all publicly available sources and reflected such information in American Renal's public stock price. Under these circumstances, all purchasers of American Renal's common stock during the Class Period suffered similar injury through their purchase of American Renal's common stock at artificially inflated prices and a presumption of reliance applies.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

188. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this

Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

189. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of American Renal who knew that the statement was materially false or misleading when made. Accordingly, any arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## CLASS ACTION ALLEGATIONS

190. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased American Renal's common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

191. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, American Renal's common stock actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there

are hundreds or thousands of members in the proposed Class. Millions of American Renal shares were traded publicly during the Class Period on the NYSE. As of March 5, 2018, American Renal had over 32.05 million shares of common stock outstanding. Record owners and other members of the Class may be identified from the records maintained by American Renal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

192. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

193. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

194. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. Whether the statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of American Renal;

c. Whether Defendants acted with scienter; and

d. To what extent the members of the Class have sustained damages and the proper measure of damages.

195. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

## FIRST CLAIM FOR RELIEF

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

196. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

197. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; and (ii) cause Lead Plaintiff and the other members of the Class to purchase American Renal's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

198. Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for American Renal's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged

below.

199. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about American Renal's financial well-being, operations and prospects, as specified herein.

200. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of American Renal's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about American Renal and its business, operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

201. Each of the Individual Defendants' primary liability, and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, products, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team,

internal reports and other data and information about the Company's finances, operations, and sales at all relevant times, including communications with governmental and regulatory agencies; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false.

202. The Defendants had actual knowledge of the misrepresentations of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations were done knowingly or recklessly and for the purpose and effect of concealing American Renal's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

203. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of American Renal's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired

American Renal's common stock during the Class Period at artificially high prices and were damaged thereby.

204. At the time of said misrepresentations, Lead Plaintiff and the other members of the Class believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding American Renal's financial results and inadequacy of the Company's controls over financial reporting, which was known, or should have been known, by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their American Renal common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

205. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violation Of Section 20(a) Of The Exchange Act Against The Individual Defendants

207. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

208. The Individual Defendants acted as controlling persons of American Renal within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power

to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

209. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

210. As set forth above, American Renal and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts as alleged in this Complaint. By virtue of their positions, each as controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of American Renal's and the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows

(a) Declaring this action to be a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Finding Defendants violated the law as allege above;

(c) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly or severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

(d) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e) Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury for all issues so triable.

DATED: November 11, 2019 Respectfully submitted,

By: /s/ _Gary S. Graifman__________
Gary S. Graifman
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, NJ 07645
Tel: (201) 391-7000
Fax: (201) 307-1088
GGraifman@kgglaw.com

*Liaison Counsel for Lead Plaintiff City of Hialeah Employees' Retirement System*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Mitchell M.Z. Twersky (admitted *Pro Hac Vice*)
Atara Hirsch (admitted *Pro Hac Vice*)
Todd Kammerman
Sean M. Handron-O'Brien (admitted *Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
Tel. (212) 279-5050
Fax. (212) 279-3655
MTwersky@aftlaw.com
AHirsch@aftlaw.com

Tkammerman@aftlaw.com
SHandronobrien@aftlaw.com

- And -

Ian D. Berg (admitted *Pro Hac Vice*)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Tel. (858) 764-2580
Fax. (858) 764-2582
IBerg@aftlaw.com

*Counsel for Lead Plaintiff*
*City of Hialeah Employees' Retirement System*

**AMENDED CERTIFICATION OF PLAINTIFF**
**PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Robert W. Williams III, on behalf of the City of Hialeah Employees' Retirement System, hereby certify under penalties of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. I am the Chairman of the Board of Trustees for the City of Hialeah Employees' Retirement System ("Hialeah").

2. Hialeah has reviewed the complaints filed against American Renal Associates Holdings Incorporated ("American Renal") and certain of its directors and officers in the following actions (hereinafter, the "Actions"), and has authorized the filing of a motion for its appointment as lead plaintiff to pursue the claims alleged in the Actions on behalf of itself and the class:

*Vandevar v. American Renal Associates Holdings, Inc. et al.*, No. 2:19-cv-09074-ES-MAH (D.N.J.)

*Giljohann v. American Renal Associates Holdings, Inc. et al.*, No. 2:19-cv-10416-ES-MAH (D.N.J.)

3. Hialeah did not purchase or otherwise acquire the securities that are the subject of these actions at the direction of Hialeah's counsel or in order to participate in this or any private action under the federal securities laws or any other laws.

4. Hialeah is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. All of Hialeah's transactions in American Renal common stock during the class period as set forth in the Actions of August 10, 2016 through March 27, 2019 (the "Class Period"), are attached as Schedule A.

6. During the three years prior to the date of this certification Hialeah has served or sought to serve as a representative on behalf of a class in the following actions filed under the

federal securities laws:

> *City of Hialeah Employees' Retirement System v. FEI Company et al.*, No. 3:16-cv-01792-SI (D. Or. 2016)
>
> *Hefler et al. v. Wells Fargo & Company et al.*, No. 3:16-cv-05479 (N.D. Cal. 2016)

7. Hialeah will not accept any payment for serving as a representative party on behalf of the class beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

Executed this 14 day of June, 2019.

[signature]

Robert W. Williams III, Chairman
City of Hialeah Employees' Retirement System

**Schedule A**

**Transactions in American Renal Associates Holdings Incorporated During the Class Period of August 10, 2016 Through March 27, 2019**

| Trade Date | Transaction Type | Shares | Price Per Share | Total Amount |
|---|---|---|---|---|
| **Class Period Opening Balance** | | 2,400 | | |
| 08/19/2016 | Purchase | 300 | $20.1799 | ($6,053.97) |
| 08/19/2016 | Purchase | 300 | $19.8674 | ($5,960.22) |
| 08/19/2016 | Purchase | 200 | $19.4492 | ($3,889.84) |
| 08/22/2016 | Purchase | 300 | $20.4086 | ($6,122.58) |
| 08/25/2016 | Purchase | 100 | $21.4100 | ($2,141.00) |
| 08/30/2016 | Purchase | 200 | $22.1719 | ($4,434.38) |
| 09/02/2016 | Purchase | 200 | $21.3900 | ($4,278.00) |
| 09/13/2016 | Purchase | 300 | $19.4644 | ($5,839.32) |
| 09/15/2016 | Purchase | 100 | $19.5901 | ($1,959.01) |
| 09/19/2016 | Purchase | 100 | $18.7707 | ($1,877.07) |
| 11/14/2016 | Purchase | 300 | $20.0083 | ($6,002.49) |
| 12/01/2016 | Sale | (300) | $24.3500 | $7,305.00 |
| 12/05/2016 | Sale | (300) | $24.2872 | $7,286.16 |
| 12/07/2016 | Sale | (300) | $24.0317 | $7,209.51 |
| 12/09/2016 | Sale | (210) | $23.3651 | $4,906.67 |
| 12/09/2016 | Sale | (90) | $23.2072 | $2,088.65 |
| 12/12/2016 | Sale | (300) | $23.0520 | $6,915.60 |
| 12/15/2016 | Sale | (300) | $22.0030 | $6,600.90 |
| 12/20/2016 | Sale | (300) | $22.6394 | $6,791.82 |
| 12/30/2016 | Sale | (100) | $21.2722 | $2,127.22 |
| 08/09/2017 | Purchase | 1,000 | $15.5624 | ($15,562.40) |
| 08/21/2017 | Purchase | 400 | $14.3400 | ($5,736.00) |
| 01/31/2018 | Purchase | 200 | $18.8219 | ($3,764.38) |
| 02/12/2018 | Purchase | 200 | $17.9000 | ($3,580.00) |
| 04/10/2018 | Purchase | 300 | $16.9600 | ($5,088.00) |
| 04/11/2018 | Purchase | 700 | $16.5225 | ($11,565.75) |

| Trade Date | Transaction Type | Shares | Price Per Share | Total Amount |
|---|---|---|---|---|
| 04/18/2018 | Sale | (400) | $16.9775 | $6,791.00 |
| 05/22/2018 | Purchase | 500 | $14.9680 | ($7,484.00) |
| 06/07/2018 | Purchase | 400 | $15.0379 | ($6,015.16) |
| 06/20/2018 | Purchase | 200 | $16.4375 | ($3,287.50) |
| 08/02/2018 | Purchase | 400 | $15.8526 | ($6,341.04) |
| 11/15/2018 | Purchase | 400 | $15.3609 | ($6,144.36) |
| 11/28/2018 | Purchase | 300 | $16.7500 | ($5,025.00) |
| 02/15/2019 | Purchase | 1,000 | $12.8200 | ($12,820.00) |
| 02/21/2019 | Purchase | 400 | $12.9944 | ($5,197.76) |
| **Class Period Ending Balance** | | 8,600 | | |

**Transactions in American Renal Associates Holdings Incorporated During the Post Class Period of March 28, 2019 Through April 8, 2019**

| Trade Date | Transaction Type | Shares | Price Per Share | Total Amount |
|---|---|---|---|---|
| **Post Class Period Opening Balance** | | 8,600 | | |
| 03/28/2019 | Sale | (900) | $6.0128 | $5,411.52 |
| 03/28/2019 | Sale | (1,800) | $6.0128 | $10,823.04 |
| 03/28/2019 | Sale | (900) | $6.0418 | $5,437.62 |
| 03/28/2019 | Sale | (1,800) | $6.1414 | $11,054.52 |
| 04/01/2019 | Sale | (500) | $6.1500 | $3,075.00 |
| 04/01/2019 | Sale | (800) | $6.2143 | $4,971.44 |
| 04/01/2019 | Sale | (152) | $6.1137 | $929.28 |
| 04/05/2019 | Sale | (900) | $6.0677 | $5,460.93 |
| 04/05/2019 | Sale | (500) | $6.0677 | $3,033.85 |
| 04/08/2019 | Sale | (348) | $6.0246 | $2,096.56 |
| **Post Class Period Ending Balance** | | 0 | | |