Gary S. Graifman
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, New Jersey 07645
Fax: (201) 307-1088
Tel: (201) 391-7000
GGraifman@kgglaw.com

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Mitchell M.Z. Twersky (admitted *pro hac vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
MTwersky@aftlaw.com

*Counsel for Lead Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALI VANDEVAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RENAL ASSOCIATES HOLDINGS, INC., JOSEPH A. CARLUCCI, JASON M. BOUCHER, and JONATHAN L. WILCOX,<br><br>Defendants. | Case No.  2:19-cv-09074-ES-MAH<br>Honorable Esther Salas<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ........................................................................1

ARGUMENT ......................................................................................10

I.      LEGAL STANDARDS FOR A MOTION TO DISMISS ...........................10

II.     DEFENDANTS' MISSTATEMENTS WERE MATERIAL .......................11

    A.      The Immediate Effect of Each Corrective Disclosure on the
    Company's Share Price Shows Materiality.........................................12

    B.      The Restatement and Other Facts Alleged Also Show Materiality ....14

    C.      Defendants' Chart Distorts the Impact of the Restatement.................15

III.    PLAINTIFF PLEADS A STRONG INFERENCE OF SCIENTER.............20

    A.      The Core Operations Doctrine .........................................................24

    B.      The Confidential Witness Confirms the Individual Defendants
    Managed, Reviewed, and Reacted to Collections Information...........27

    C.      Defendants' Massive GAAP Violations ............................................31

    D.      The Individual Defendants' Resignations and Punitive Measures
    Taken by the Company ......................................................................33

    E.      The Individual Defendants Had Personal Financial Motives .............35

    F.      The SEC Put Defendants on Notice of the Accounting Issues ...........36

    G.      The Individual Defendants Did Not Buy Any Company Stock on
    the Open Market During the Class Period .........................................37

IV.     THE SECTION 20(a) CLAIM SHOULD NOT BE DISMISSED ...............39

CONCLUSION...................................................................................39

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ...................................................................36

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...............................................................................11, 12, 18

*Carmack v. Amaya Inc.*,
   258 F. Supp. 3d 454 (D.N.J. 2017)...............................................................24

*Fouad v. Isilon Sys., Inc.*,
   No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008).........33

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) ............................................................17, 18, 19

*Gebhardt v. ConAgra Foods, Inc.*,
   335 F.3d 824 (8th Cir. 2003) ....................................................12, 15, 17, 18

*In re Adaptive Broadband Sec. Litig.*,
   No. C 01-1092 SC, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002).............33, 35

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ...................................................................21, 22

*In re AFC Enter., Inc. Sec. Litig.*,
   348 F. Supp. 2d 1363 (N.D. Ga. 2004)..............................................25, 31, 32

*In re Am. Bus. Fin. Servs. Noteholders Litig.*,
   No. 08-0784, 2008 WL 3405580 (E.D. Pa. Aug. 11, 2008)..........................37

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) .....................................................11, 13, 15, 17

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
   No. 3:17-cv-6436 (PGS) (DEA), 2019 WL 1299673
   (D.N.J. Mar. 21, 2019)...................................................................................25

*In re ECOtotality, Inc. Sec. Litig.*,
No. 13-03791-SC, 2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ...............21

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................37

*In re Hertz Global Holdings Inc*,
905 F.3d 106 (3d Cir. 2018) .................................................................*passim*

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d, 1248 (N.D. Cal. 2000).....................................................31

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) ...............................................................10, 12

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000).........................................................31

*In re NPS Pharms., Inc.*,
No. 2:06-CV-00570, 2007 WL 1976589 (D. Utah July 3, 2007) ........... 30-31

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ....................................................................24

*In re PTC Therapeutics, Inc. Sec. Litig.*,
No. 16-1124 (KM) (MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) .....25

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005).....................................................................25

*In re Synchronoss Sec. Litig.*,
705 F. Supp. 2d 367 (D.N.J. 2010)............................................................17

*In re Synchronoss Techs., Inc. Sec. Litig.*,
No. 17-2978 (FLW) (LHG), 2019 WL 2849933
(D.N.J. July 2, 2019)..........................................................................29, 35

*In re Toronto-Dominion Bank Sec. Litig.*,
No. 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) .............25

*In re Urban Outfitters Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015)...........................................................25

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...............................................................22, 28

*In re Westinghouse Sec. Litig*,
   90 F.3d 696 (3d Cir. 1996) ...........................................................................18

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
   286 F. Supp. 2d 1047 (D. Minn. 2003) .......................................................12

*Inst'l Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...............................................................*passim*

*Lefkoe v. Jos. A. Bank Clothiers*,
   No. WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007)................30

*Litwin v. Blackstone Group, L.P.*,
   634 F.2d 706 (2d Cir. 2011) .................................................................11, 18

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ................................................................ 21-22

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .................................................................22, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27, 45 n.12 (2011) ..........................................................11, 12, 18

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014)...........................................................37

*Nakkhumpun v. Taylor*,
   782 F.3d 1142 (10th Cir. 2015) ...................................................................30

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010)........................................................13, 29

*N.M. State Inv. Council v. Ernst & Young, LLP*,
  641 F.3d 1089 (9th Cir. 2011) ..........................................................................31

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ........................................................25, 35, 37

*Oran v. Stafford*,
  226 F.3d 275, 282 (3d Cir. 2000) .......................................................11, 13

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...........................................................................39

*Pirraglia v. Novell, Inc.*,
  339 F.3d 1182 (10th Cir. 2003) ....................................................................36

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ...................................................................27, 29

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .........................................................................24

*SEC v. Espuelas*,
  908 F. Supp. 2d 402 (S.D.N.Y. 2012) ...........................................................14

*SEC v. Kelly*,
  663 F. Supp. 2d 276 (S.D.N.Y. 2009) ...........................................................14

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ............................................................. 11-12, 22

*South Ferry LP, #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .........................................................................21

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)........................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................... 10, 21, 30, 35-36

*West Palm Beach Police Pension Fund v. DFC Global Corp.*,
　　No. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015) .....................25, 33

*Zak v. Chelsea Therapeutics Intern., Ltd.*,
　　780 F.3d 597 (4th Cir. 2015) ................................................................11, 35

**Statutes and Other Authorities**

Fed. R. Civ. P. 15(a)(2) ........................................................................................39

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999), 1999 WL
1123073 .................................................................................................................19

## STATEMENT OF FACTS

Defendant American Renal Associates Holdings, Inc. ("American Renal" or the "Company") went public in April 2016. For three years, Class members made investment decisions based on financial reports that were materially false and could not be relied upon due to basic improper accounting and a complete lack of controls over financial reporting. Defendants now claim that these false financial reports – which substantially overstated net income for the entire period and for almost all of the individual periods reported on – were immaterial because of the magnitude of the subsequent line item accounting corrections contained in the Restatement (defined below) finally announced more than five months after the Class Period (August 10, 2016 through March 27, 2019). This argument misses the point of Plaintiff's allegations, which is that investors in reality invested as if blind-folded because they were relying on quarter over quarter and year over year financial results that were unreliable. No one line item matters when the Company admits that the entirety of the report cannot be relied upon – and the significant stock drops upon the corrective disclosures during and at the end of the Class Period demonstrate the point.

Defendant American Renal describes itself as "the largest dialysis services provider in the United States focused exclusively on joint venture partnerships with

physicians." ¶¶2, 15, 21.[1] The Company's initial public offering ("IPO") was in April 2016 and since then its common stock has been actively traded on the New York Stock Exchange (the "NYSE"). ¶¶15, 184-87; Complaint Ex. A (Company's 2018 Form 10-K) at 54, 64. At all relevant times, the Company's only source of revenues was the delivery of dialysis treatments and related services to patients. ¶¶3, 22; Complaint Ex. A at F-4.

Defendant Joseph A. Carlucci ("Carlucci") is a co-founder of American Renal who has served as its Chief Executive Officer ("CEO") since 2006, and as Chairman of the Board of Directors since 2012. ¶16. Defendant Jonathan L. Wilcox ("Wilcox") was Vice President and Chief Financial Officer ("CFO") of the Company from 2011 until he resigned on September 30, 2018 in the face of the impending Securities and Exchange Commission ("SEC") investigation of the Company's accounting. ¶¶5, 18. Defendant Jason M. Boucher ("Boucher" and, together with Carlucci and Wilcox, the "Individual Defendants"), who succeeded Wilcox, was Vice President and CFO of the Company from October 1, 2018 until he too resigned, effective March 26, 2019. ¶¶17, 34.

As detailed in the Complaint (*see* ¶¶30, 84-167), throughout the Class Period (August 10, 2016 through March 27, 2019), the Company misled investors by

---

[1] References to "¶_" are to paragraphs of Plaintiff's Consolidated Amended Complaint (the "Complaint"), filed November 11, 2019 (Dkt. No. 34).

issuing false financial reports and touting the effectiveness of its internal accounting controls while reporting financial results that did not comply with Generally Accepted Accounting Principles ("GAAP"). In addition, the Company's SEC filings included Sarbanes-Oxley Act of 2002 ("SOX") certifications, the Individual Defendants signed, attesting to the accuracy of the financial and other information in the filing and to the sufficiency and effectiveness of the Company's internal accounting controls. Defendants have admitted the Company's false financial reports and lack of internal accounting controls through the Restatement.

As set forth more fully herein, the totality of the facts alleged show that, in providing false assurances to the public, the Individual Defendants acted with knowledge, or at a bare minimum with extreme recklessness. The Individual Defendants, who oversaw and certified the Company's financial reporting, which unquestionably was a core operation of the business, were experienced and knowledgeable about accounting. They managed the information concerning the Company's actual collections, which were subsequently found to be inconsistent with the Company's financial reporting, particularly with respect to net income. The accounting misstatements were persistent and massive, affecting five years of financial results. And, the Individual Defendants had personal financial motives.

On November 9, 2018, in its Form 10-Q for the third quarter 2018, the Company disclosed that the SEC had "requested that the Company voluntarily

3

provide documents and information relating to certain revenue recognition, collections and related matters." The SEC investigation announcement came just after the resignation of CFO Wilcox, on September 30, 2018. Following that adverse news – the first of three partial corrective disclosures during the Class Period – the Company's share price fell more than 4%[2] the next trading day, Monday, November 12, on unusually high trading volume (472,299 shares). ¶¶31, 37, 159, 180; Mortenson Dec. Ex. 6 at 14.

Along with the announcement of the SEC inquiry, Defendants continued to report false financial results. As the Restatement later admits, among other things, net income for the third quarter 2018 materially overstated by $5.782 million. (Originally reported as $18.294 million, net income for the quarter was later restated as $12.512 million.) Moreover, Defendants continued to repeat their false assurances that the Company's accounting controls and procedures were effective and that its reported financial results complied with GAAP and could be relied upon by investors. ¶¶32, 160-67, 180.

Following receipt of the SEC request, the Company produced documents and information to the SEC, and the Audit Committee of the Company's Board of Directors "began a review of [the Company's] revenue recognition methodology and

---

[2] The Complaint mistakenly gives $10.46 as the closing price on November 12, 2018. The correct closing price that day was $16.76. *See* Mortenson Declaration ("Mortenson Dec.") Ex. 6 (Dkt. No. 38-8) at 14.

relating accounting matters, including internal control over financial reporting related to revenue recognition and related matters." ¶37.

On March 8, 2019, the Company filed with the SEC a Form NT 10-K (Notification of Late Filing) announcing it was unable to timely file its annual report on Form 10-K for the fiscal year ended December 31, 2018, which was due March 18, 2019. The Company disclosed that the Audit Committee's review was continuing and that, with its outside advisors, the Audit Committee was "examining reserve computations and other accounting practices that could have an impact on accounts receivable and revenue" for 2018, as well as the previously reported fiscal years 2014 through 2017, the quarters within those years, and the first three quarters of 2018. ¶¶33, 168; American Renal Form 12b-25/NT 10-K, filed Mar. 8, 2019.[3]

On this news – the second partial corrective disclosure – the Company's share price fell another 16%, or $2.05 per share, from the March 7 closing price of $12.51 to close at just $10.46 per share on March 8. ¶¶33, 168, 181; Mortenson Dec. Ex. 6 at 16. The huge trading volume (1,018,772 shares) was the highest since July 2017. *See* ¶¶33, 168; Mortenson Dec. Ex. 6 at 7-16.

On March 21, 2019, American Renal's Board concluded that the Company's previously issued financial statements and other financial data for the fiscal years

---

[3] *See* https://www.sec.gov/Archives/edgar/data/1498068/000149806819000006/a12-31x18nt10xk.htm (last accessed Feb. 7, 2020).

5

ended December 31, 2014, 2015, 2016, and 2017 (contained in its Form 10-K filings for fiscal years 2016 and 2017), and for the fiscal quarters and year-to-date periods ended March 31, June 30, and September 30 in 2016, 2017, and 2018 (contained in its Form 10-Q filings for those quarters) (the "Restated Periods") "should be restated and should no longer be relied upon." ¶37. The Audit Committee "concluded that [the Company's] consolidated financial statements for the Restated Periods were not prepared in accordance with [GAAP] …" *Id.*

The very next week, on March 27, 2019, the last day of the Class Period, the Company announced that investors should no longer rely on its previously issued financial statements for the Restated Periods (2014 through 2018). The Company also announced that management's previous assessment of internal control over financial reporting should no longer be relied upon. Further, the Company announced the resignation of its second CFO in six months, when CFO Boucher resigned, effective March 26, 2019 – as part of the Company's efforts "to remediate [its] material weaknesses associated with [its] control environment." ¶¶5, 34, 41, 169, 182.

As a result of this corrective disclosure, the Company's share price fell another $3.69, more than 38%, from its March 27 closing price of $9.70 to close at just $6.01 on March 28. ¶¶34, 169, 182; Mortenson Dec. Ex. 6 at 16. The total drop upon the three corrective disclosures was $6.48 per share. During the Class Period,

American Renal shares, artificially inflated by Defendants' wrongdoing, had traded as high as $25.42 (on November 17, 2016). Mortenson Dec. Ex. 6 at 3. On November 8, 2018, just before Defendants' first corrective disclosure, the Company's stock closed at $20.27. *Id.* at 14. The extraordinary trading volume (3,077,545 shares) on March 28 was the highest since the Company's common stock first began trading on the NYSE in April 2016. *See id.*; Mortenson Dec. Ex. 6 at 2-16.

The same day, March 28, 2019, the Company received a subpoena from the SEC that reiterated the SEC's October 2018 request and required the production of additional documents and information. ¶¶35, 37. On June 19, 2019, the Company received a second SEC subpoena requiring the production of more related documents and information. *Id.*

On September 5, 2019, more than five months after the Class Period, the Company finally filed its 2018 Form 10-K. Defendants admitted that serious accounting improprieties required the Company to restate its previously issued annual and quarterly financial results for the Restated Periods (2014 through 2018), including all of the reported results since the Company's April 2016 IPO (the "Restatement"). Defendants conceded that the previously issued financial statements "were not prepared in accordance with [GAAP]," as Defendants had assured the market during the Class Period, and "should no longer be relied upon." ¶¶36-37. Defendants stated that, in total, the Restatement adjustments for the Restated Periods

7

"resulted in a net decrease to income before income taxes of $15.2 million." ¶37.[4]

By comparison, for 2018, American Renal reported income before income taxes of $25.363 million.  Complaint Ex. A at F-4.

Defendants' revisions of quarterly and annual net income reported during the Class Period were dramatic:

| Financial Period | Net Income As Initially Reported (millions) | Net Income As Revised (millions) | Change (millions) | Change % | Complaint ¶¶ |
|---|---|---|---|---|---|
| **2018** | | | | | |
| 3Q 2018 | $18.294 | $12.512 | -$5.782 | -31.6% | ¶¶160, 163 |
| 2Q 2018 | $2.277 | ($8.383) | -$10.660 | -468.1% | ¶¶151, 154 |
| 1Q 2018 | $13.713 | $7.164 | -$6.549 | -47.7% | ¶¶143, 146 |
| **2017** | | | | | |
| FY17 | $75.683 | $58.136 | -$17.547 | -23.1% | ¶¶134, 137 |
| 4Q 2017 | $19.718 | $10.824 | -$8.894 | -45.1% | ¶¶134, 137 |
| 3Q 2017 | $26.672 | $25.791 | -$0.881 | -3.3% | ¶¶126, 129 |
| 2Q 2017 | $16.391 | $9.759 | -$6.632 | -40.4% | ¶¶118, 121 |
| 1Q 2017 | $12.902 | $11.762 | -$1.14 | -8.85% | ¶¶110, 113 |
| **2016** | | | | | |
| 4Q 2016 | $16.560 | $12.390 | -$4.17 | -25.1% | ¶¶102, 105 |
| 3Q 2016 | $36.046 | $36.117 | +$0.071 | +0.2% | ¶¶94, 97 |
| 2Q 2016 | $13.042 | $21.169 | +$8.127 | +62.3% | ¶¶84, 87 |

---

[4] Carefully calculated to mask their wrongdoing, Defendants noted in the 2018 10-K that, on a cumulative basis, "including fiscal year 2013 and periods prior to 2013," which Defendants do not specify, "the restatement adjustments resulted in a net increase to income before income taxes of $5.4 million." ¶37. Yet, fiscal 2013 and prior periods pre-date the Company's April 2016 IPO, the Restated Periods, and the Class Period, and are not relevant to this case. For the years in the Class Period, *i.e.*, 2016, 2017, and 2018, the effect of the Restatement was undeniably negative.

In sum, after the second and third quarters of 2016, the effect of the Restatement on every subsequent quarter reported during the Class Period was negative, *i.e.*, previously reported net income was consistently overstated – a trend indicative of intentional misconduct. Defendants are wrong that the adjustments "lack a common directional bias" (Defs. Br. 22).[5]

The Restatement confirmed that the Company was failing to reconcile revenue and accounts receivable to the Company's collection experience and actual cash collections, *i.e.*, the Company was recognizing revenues that it had no reasonable basis to expect to collect. This accounting machination also impacted the fair market value of noncontrolling interests in the Company's partnerships with physicians. *See* ¶37.

In addition, the Company sought to address its admitted material weakness with respect to internal accounting control by announcing a "Remediation Plan for Material Weaknesses in Internal Control over Financial Reporting and Status." As part of this plan, CFO Boucher "resigned" and was replaced by an interim CFO *and* interim Chief Accounting Officer. *See* ¶¶38-41.

---

[5] References to "Defs. Br. _" are to Memorandum of Law in Support of Defendants' Motion to Dismiss (Dkt. No. 38-1).

9

The 2018 10-K reported the SEC investigation "is ongoing" and the Company "may receive additional related subpoenas or other requests for documents and information from the [SEC] Staff." ¶37.

Defendants' false and misleading statements caused and maintained artificial inflation in the trading price of the Company's stock throughout the Class Period until the truth about the Company's financial practices, procedures, and reporting was revealed to the market. As a result, Lead Plaintiff and Class members who purchased American Renal shares during the Class Period and still held those shares when their trading price collapsed upon Defendants' revelations of their accounting improprieties suffered significant economic loss. ¶¶176-83. By reason of the foregoing, all the Defendants violated §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and the Individual Defendants also violated §20(a) of the Exchange Act (controlling person liability).

## ARGUMENT

### I.    LEGAL STANDARDS FOR A MOTION TO DISMISS

When "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must . . . accept all factual allegations in the complaint as true [and] consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "In reviewing the motion to dismiss, we must accept as true all facts alleged in the complaint and view them in the light most favorable to [the plaintiff]."

10

*In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 266 (3d Cir. 2005). *See also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47-49 (2011).

A court is "not permitted to go beyond the facts alleged in the Complaint and the documents on which the claims made therein were based." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424-25 (3d Cir. 1997). Even "when a court considers relevant facts from the public record at the pleading stage, the court must construe such facts in the light most favorable to the plaintiffs." *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

## II. DEFENDANTS' MISSTATMENTS WERE MATERIAL

For purposes of §10(b) and Rule 10b-5, a fact is "*material*" if there is "'a substantial likelihood'" that it "'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). *Accord Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). Even though there is no need to prove it,[6] it is hard to imagine that an investor would not have acted differently had they known the financials could not be relied upon.

The Third Circuit has instructed that "the issue of materiality typically

---

[6] *See TSC*, 426 U.S. at 444 ("no need to demonstrate . . . a decisive effect"); *Litwin v. Blackstone Group, L.P.*, 634 F.2d 706, 717 (2d Cir. 2011).

11

presents a mixed question of law and fact, and that the delicate assessment of inferences is generally best left to the trier of fact." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000). "The district court should decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question." *Id.* Additionally, the Supreme Court has stated:

> The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*TSC*, 426 U.S. at 450 (emphasis added; footnote & citations omitted). *See also Matrixx*, 563 U.S. at 38-47 (rejecting "bright-line" approach to materiality); *Basic*, 485 U.S. at 236 (materiality is "inherently fact-specific finding"). It is enough for Plaintiff to "raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement." *Matrixx*, 563 U.S. at 46. The heightened pleading standard of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") does not apply to "materiality."[7]

---

[7] *See Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 n.3 (8th Cir. 2003); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1055 (D. Minn. 2003).

### A. The Immediate Effect of Each Corrective Disclosure on the Company's Share Price Shows Materiality

The Third Circuit has held that, where, as here, the securities trade in an efficient market (¶¶184-87), "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Merck*, 432 F.3d at 274 (quoting *Oran*, 226 F.3d at 282). "[I]n efficient markets materiality is defined as 'information that alters the price of the firm's stock.'" *Id.* at 273-74 (quoting *Burlington*, 114 F.3d at 1425).

Each corrective disclosure that Plaintiff alleges was followed by a substantial drop in the Company's share price.[8] Under the Third Circuit's test ignored by Defendants, that alone, establishes materiality. Thus:

- On November 9, 2018, Defendants revealed the SEC had requested the Company provide documents and information "relating to revenue recognition, collections, and related matters." The next trading day, November 12, the Company's share price fell $0.74, more than 4%, to close at $16.76, on unusually high trading volume. ¶¶31, 159, 180; Mortenson Dec. Ex. 6 at 14.

---

[8] Defendants make no loss causation argument that the drop in the price of the Company's stock after each corrective disclosure was due to anything other than the revelation of the alleged fraud, nor would it be proper on a motion to dismiss for Defendants to offer evidence for the Court to resolve a contested issue of fact. Moreover, "Plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation, rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)." *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010).

- On March 8, 2019, the Company announced it would delay filing its 2018 10-K as it continued to examine reserve computations and other accounting practices that might have an impact on its accounts receivable and revenue for 2018, as well as previously reported results for fiscal years 2014 through 2017. On that news, the Company's stock price fell $2.05 per share, more than 16%, to close at $10.46 on March 8, on extremely high volume. ¶¶33, 168, 181; Mortenson Dec. Ex. 6 at 16.

- On March 27, 2019, the end of the Class Period, the Company announced investors no longer should rely on its previously issued financial statements and accounting practices and controls for the Restated Periods. The next day, March 28, the Company's share price fell $3.69, more than 38%, to close at just $6.01, on huge volume. ¶¶34, 169, 182; Mortenson Dec. Ex. 6 at 16.[9]

### B.    The Restatement and Other Facts Alleged Also Show Materiality

Moreover, the fact of the Restatement, and Defendants' public statements concerning it, also conclusively show materiality. "[U]nder [GAAP], a restatement issues only when errors are material." *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("[T]hat AOL restated its revenues … belies any suggestion that any misstatement or omission was not material."); *see also SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 (S.D.N.Y. 2012) ("the fact of the restatement is sufficient" to establish "a genuine issue of material fact as to whether StarMedia's filings

---

[9] Defendants note that the price of American Renal stock rose by $1.33 upon the Restatement. Defs. Br. 8. However, that announcement was more than five months after the Class Period, when the market already understood and adjusted to the fact that the Company issued false and unreliable financial statements. The subsequent rise – which is not part of Plaintiff's claims – relates to new information based on the adjusted market expectations after the corrective disclosures.

14

materially misstated the quality or quantity of revenue") (defendant's motion for summary judgment denied).

The Restatement covered five years of financial results, 2014 through 2018, including all results since the Company's April 2016 IPO. ¶¶37-38. And, the Restatement had a substantial impact on the Company's reported earnings, which is "among the pieces of data that investors find most relevant to their investment decisions." *Burlington*, 114 F.3d at 1420 n.9, 1427 ("[I]nformation about a company's past and current earnings is likely to be highly 'material.'"); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003) ("Most investors would consider it significant, no matter what the mix of information available, that a company was not earning as much as it was claiming to earn.").

### C.   Defendants' Chart Distorts the Impact of the Restatement

Defendants proffer a chart created for this motion that presents each metric affected by the Restatement separately as if it were a distinct misstatement and then compares the change in that number (other than accounts receivable) to total revenues to show its purported lack of materiality. Mortenson Dec. Ex. 1. Defendants' presentation is fundamentally flawed, and should be disregarded.

Defendants ignore that this case is about Defendants' false assurances that the Company's financial statements were accurately prepared in accordance with GAAP and could therefore be relied upon and that the Company's accounting practices were

effective and sufficient. When the truth concerning those facts was disclosed to the market, investors' reaction was unmistakable. The substantial drop in American Renal's stock price demonstrates the materiality of the true facts concerning its financial reporting and practices, *i.e.*, that they would have altered the total mix of information available to investors when they purchased the stock. Notwithstanding this crucial flaw, Defendants' presentation still is of no avail for at least two critical reasons.

First, Defendants' strategy of attacking each metric in isolation disregards that, as Defendants themselves explained in the Company's 2018 10-K, virtually all the restated numbers emanated from the same improper accounting machination: Defendants' failure to reconcile revenue and accounts receivable to the Company's collection experience and actual cash collections. *See* ¶37. That core error had a cascading effect throughout the entirety of the Company's reported financial results, ultimately impacting the Company's bottom line. To assess each restated line item separately, as if it were a distinct misstatement, undermines the totality of the Restatement, *i.e.*, that investors could not trust *any* of the Company's reported financials for the Restated Periods since the Company was recognizing revenues, and more important net income, it had no reasonable expectation to collect due to known contractual allowances.

Second, Defendants compare each affected metric – *i.e.*, changes in operating

16

income, net income, and adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) – to "total revenue," without any indication of correlation or causation.[10] *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 164-65 (2d Cir. 2000) ("the items in issue should be compared to like items on the corporate financial statement") (citing cases); *ConAgra*, 335 F.3d at 830 ("More than a revenue loss was involved here. There was also a loss in net income, a figure that may be of more significance to investors."). Defendants offer no explanation why investors would focus exclusively on how total revenues were affected rather than considering the impact on income, which, as noted above, the Third Circuit has recognized to be "among the pieces of data that investors find most relevant," *Burlington*, 114 F.3d at 1420 n.9. In discussing the "Effects of Restatement," the 2018 10-K repeatedly focuses on income and does not mention revenues. *See* ¶37. Defendants' apples and oranges comparison of income and revenues should be rejected.[11]

---

[10] Illustrating the absurdity of Defendants' analysis, for 2018, the 2018 10-K reported net income of $22.467 million and revenues of $805.776 million. Complaint Ex. A at F-4. According to Defendants, if all the 2018 net income were erased and reduced to zero, that would be immaterial to investors because it is only 2.8% of revenues.

[11] None of the cases Defendants cite (Defs. Br. 15-16 & n.8) determines materiality by analyzing a change in earnings as it relates to revenues. *See, e.g., Burlington*, 114 F.3d at 1427 (reduction in discounts received on merchandise purchases had "negligible" impact on total costs); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 409-10 & n.55 (D.N.J. 2010) (comparing company's actual revenues with projected revenues); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP*

Not only is Defendants' attack on individual line items in the financial statements one-by-one and as each relates to total revenues all wrong, but also there is no support for their suggestion that any adjustment under 5% is immaterial, as a matter of law. Moreover, while some individual restated metrics may have been impacted by less than 5%, in virtually all instances the quarterly and annual effects of the Restatement on the Company's bottom line far exceeded 5%.

Furthermore, the Supreme Court and other courts have rejected a "bright-line" statistical test of materiality. *See Matrixx*, 563 U.S. at 39-40, 43-45; *Basic*, 485 U.S. at 236, 249-50 ("Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive- or underinclusive."); *see also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 n.14 (3d Cir. 1996) ("[W]e also reject defendants' similarly categorical assertion that materiality must be quantified at a specified percentage of income or assets."); *Litwin*, 634 F.3d at 717 ("'[W]e have consistently rejected a formulaic approach to assessing . . . materiality . . . .'") (quoting *Ganino*, 228 F.3d at 162); *ConAgra*, 335 F.3d at 830 ("[T]he quantity of a revenue overstatement, in and of itself, is not sufficient to be dispositive of [materiality].").

---

*Morgan Chase Co.*, 553. F.3d 187, 204 (2d Cir. 2009) (reclassifying 0.3% of total assets from one category to another not material).

18

Defendants' contention that SEC Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45150 (1999), 1999 WL 1123073, sets a 5% threshold for materiality is misplaced. First, SAB 99 explains, a 5% threshold, or any bright-line test of materiality, "has no basis in the accounting literature or the law." 1999 WL 1123073, at *2. Furthermore, SAB 99 represents a pre-*Matrixx* view of the SEC staff and is not purported to be an official SEC position or controlling authority. *See Ganino*, 228 F.3d at 163 (SAB 99 "does not carry with it the force of law"). SAB 99 notes that quantifying the magnitude of a misstatement "is only the beginning of an analysis" and "that there are numerous circumstances in which misstatements below 5% could well be material." *Id.* at *2-3.

Indeed, SAB 99 identifies a number of considerations pertinent here "that may well render material a quantitatively small misstatement,"[12] including:  whether the misstatement masks a change in earnings or other trends; whether the misstatement changes a loss into income or vice versa; whether the misstatement concerns a segment or portion of the company's business that has been identified as playing a significant role in the company's operations or profitability; whether management expects the misstatement may result in a significant market reaction; whether the

---

[12] Misconstruing SAB 99, Defendants urge that the qualitative factors SAB 99 discusses are an additional hurdle to establishing materiality even when the misstatement is not quantitatively small.

misstatement has the effect of increasing management's compensation; and whether the misstatement was intentional. 1999 WL 1123073, at *3-4, 6.

Defendants also contend that some individual numbers that later were restated – while incontestably false – were not materially misleading because, when the Company restated, "investors learned good news" (Defs. Br. 12), *i.e.*, that revenue or income was higher than the Company previously had reported. Defendants miss the point of Plaintiff's allegations that investors learned they were relying on false financial statements during the Class Period. The actual restated numbers were new information that was outside the Class Period and irrelevant to investors who relied on false financials during the Class Period. Moreover, in aggregate, the restated results for the Class Period were negative. (The Restatement adjustments for the Restated Periods resulted in a net decrease to income before income taxes of $15.2 million, ¶37, and the effect of the Restatement was consistently negative from the fourth quarter 2016 though the third quarter 2018.)

Defendants also are mistaken in asserting that their false assurances that the Company's financial reporting was accurate and GAAP compliant and that its disclosure controls and procedures were effective are entirely "derivative of the 67 challenged line items on [American Renal's] financial statements." *See* Defs. Br. 12 n.5. Defendants miss that the restated numbers are not what caused the Company's stock price to decline during and at the end of the Class Period but rather it was the

20

fact that the financial statements and accounting practices were revealed to be unreliable. The market thereafter priced the Company's stock accordingly, not yet knowing what the precise impact would be on the Company's previously reported results.

## III.    PLAINTIFF PLEADS A STRONG INFERENCE OF SCIENTER

The scienter standard under the PSLRA "requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009) (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534-35 (3d Cir. 1999)) (footnote omitted). Plaintiff more than satisfies this standard as to all Defendants. A court must consider "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original).

A "strong inference" of scienter is one that is "cogent and **at least as** compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324 (emphasis added).[13] The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* "[A] tie favors the plaintiff." *Lormand v. US Unwired, Inc.*, 565

---

[13] *See In re ECOtotality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 WL 4634280, at *4 (N.D. Cal. Sept. 16, 2014) ("*Tellabs* does not grant defendants an opportunity to provide competing *evidence* at the pleadings stage.") (emphasis in original).

F.3d 228, 254 (5th Cir. 2009). The Third Circuit has explained that the analysis must be "case specific":

> It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter. *See South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").

*Avaya*, 564 F.3d at 269.

Recklessness is "a sufficient basis for liability." *Advanta*, 180 F.3d at 535 (liability for recklessness "promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud"). *See Cendant*, 223 F.3d at 176 (plaintiffs "must only show that the alleged misrepresentations were reckless"); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5."); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs II*") ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.") (quoted in *Avaya*, 564 F.3d at 270).

22

As detailed herein, it is unimaginable that the Company's CEO, Carlucci, with years of experience in the industry and a degree in accounting, and its CFO's, Wilcox and Boucher – who routinely reported and verified the accuracy of the Company's financial results, which clearly was a core operation – did not realize that the transaction price the Company was using to book revenue did not accurately reflect what the Company really received. Defendants were obviously put on notice in reviewing the Company's financial information, including net income (which Defendants directly reported on through SEC filings and analyst calls) and actual collections (through periodic reports they received and acted on, as related by the confidential witness, CW-1), that these financial reports were false and unreliable or, at minimum, that a substantial risk existed that the transaction price used to book revenue was not in line with collections, which would cause them to be false and unreliable. This was especially true after the SEC began its investigation and CFO Wilcox resigned. Yet, Carlucci and Boucher continued with the same misrepresentations. All along, Defendants chose either intentionally or recklessly to conceal or ignore this information, particularly in the face of the consistent shortfall (beginning early in the Class Period) in collections relative to the prices being used to book revenues. This occurred while the Individual Defendants enjoyed personal pecuniary benefits from the inflation of the Company's financial results and its stock price.

23

Violating *Tellabs*' mandate that the Complaint be judged in its entirety, Defendants attack the facts alleged one by one without ever considering, even cursorily, whether, taken collectively, they establish a strong inference of scienter. Throughout, Defendants rely on language from cases that a particular type of allegation by itself, without more, is insufficient, as if Plaintiff alleges no other facts. The Third Circuit has rejected such a piecemeal analysis:

> Whatever the merits of this approach before *Tellabs*, it is in tension with the prescriptions issued in that case. We are to judge "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, [551 U.S. at 323]. Given this instruction, we are hesitant to formulate categorical rules about the sufficiency of different types of allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance.

*Avaya*, 564 F.3d at 272-73. *See also id.* at 273 n.46 ("facts innocent in themselves may appear more suspicious in the company of other facts").

### A.     The Core Operations Doctrine

The Individual Defendants were at the top of the Company. It is "reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014).[14]

---

[14] The Individual Defendants' scienter is imputed to the Company. *See Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 468 (D.N.J. 2017). The Third Circuit has left open the question whether the Company's knowledge is limited to what the Individual Defendants knew. *Hertz*, 905 F.3d at 121 n.6. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 477 (6th Cir. 2014) ("[A] corporation is not insulated if lower-level employees, contributing to the misstatement, knowingly provide false information

24

> "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give[] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge."

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, No. 3:17-cv-6436 (PGS) (DEA), 2019 WL 1299673, at *16 (D.N.J. Mar. 21, 2019) (quoting *In re Urban Outfitters Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015)) (finding strong inference of scienter).[15] In *Avaya*, the Third Circuit held: "The perceived importance of margins

---

to their superiors with the intent to defraud the public."); *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665 (NLH/JS), 2018 WL 6381882, at *19-20 (D.N.J. Dec. 6, 2018) (noting Third Circuit has yet to decide issue of corporate scienter and, "[w]hile the outcome remains unknown, this Court cannot hold that Plaintiffs have failed to state a claim merely because the law is unsettled").

[15] *See Tellabs II*, 513 F.3d at 709 ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit."); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005) ("The financial strength of the Company was undoubtedly a matter of principal concern to its Chief Executive Officer and Chief Financial Officer.") (quoted in *Avaya*, 564 F.3d at 271); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 943 & n.21 (9th Cir. 2003); *Toronto-Dominion Bank*, 2018 WL 6381882, at *17 ("[L]ike *Avaya*, it appears here Individual Defendants made statements concerning the Canadian retail segment and internal controls and the Canadian retail segment was of central importance to TD Bank's success. That is enough at the pleading stage to support the core operations doctrine."); *In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017); *West Palm Beach Police Pension Fund v. DFC Global Corp.*, No. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015), at *16 ("The fact that the allegations of fraud relate to Defendants' core business supports . . . an inference [of scienter]. . . . Payday loans accounted for a majority of DFC Global's revenues . . . .") (citing cases); *Urban Outfitters*, 103 F. Supp. 3d at 653-54; *In re AFC Enter., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1375 (N.D. Ga. 2004) ("It looks like the company's earnings were being manipulated to

25

supports an inference that McGuire, Avaya's Chief Financial Officer, was paying close attention to these numbers." 564 F.3d at 271. Certainly, here, the Company's net income, which was substantially misstated quarter after quarter, was no less important.

A co-founder of the Company, Defendant Carlucci has been its CEO since 2006 and Chairman of its Board of Directors since 2012. ¶16. According to the 2018 Form 10-K, Carlucci "has more than 40 years of experience in the dialysis service industry" and holds a B.S. in Accounting. Complaint Ex. A at 125. Defendants Wilcox (from 2011 to September 30, 2018) and Boucher[16] (from October 1, 2018 to March 26, 2019) each served as the Company's CFO. ¶¶17-18. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) ("Typically, the chief financial officer is second only to the chief executive officer in the management of a corporation's financial affairs.").

The Individual Defendants were directly involved in the Company's day-to-day operations and in its financial oversight. ¶¶20, 172. They personally certified the Company's financial reports, pursuant to SOX, and signed its SEC filings. *See* ¶¶8, 16-18, 83-85, 92, 94-95, 101-103, 109-11, 117-19, 125-27, 133-35, 142-44, 150-52,

---

meet market expectations. If that was happening, the most likely senior executive to know about it would be the chief financial officer.").

[16] Before he became CFO, Boucher worked closely with CFO Wilcox for seven years, first as Vice President of Finance beginning in May 2011 and then also as Chief Accounting Officer and Treasurer beginning in January 2017. ¶¶9, 17.

158-59, 161, 167. They spoke for the Company during the earnings calls with analysts and discussed its financial results. *See* ¶¶86, 96, 104, 112, 120, 128, 136, 145, 153, 162. Just prior to the Class Period, CEO Carlucci and CFO Wilcox took part in "evaluat[ing] the effectiveness of [the Company's] disclosure controls and procedures." ¶89.

Although Plaintiff does not rely *only* on allegations concerning the Individual Defendants' roles as the Company's senior managers in charge of its accounting and financial reporting in seeking to infer their scienter, but given the nature and significance of Defendants' misrepresentations and the importance of the matters at issue to the Company's bottom line, those allegations here are especially powerful.[17]

## B. The Confidential Witness Confirms the Individual Defendants Managed, Reviewed, and Reacted to Collections Information

Even more compelling, according to CW-1, a collection and reimbursement specialist at the Company's corporate headquarters from January 2017 to April 2019,[18] covering most of the Class Period (August 10, 2016 to March 27, 2019), the

---

[17] Defendants' reliance on *Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013), is unavailing. In *Rahman*, the court explained: "the core operations doctrine cannot apply because, in spite of customs violations at three of the four Kid Brands subsidiaries, the $10 million in anticipated liabilities covering wrongful conduct over a nearly five-year span cannot be regarded as affecting the 'core operations' of a company that had hundreds of millions of dollars in annual net sales." 736 F.3d at 247. Here, there were no subsidiaries involved and the impact on the Company's overall net sales was highly material.

[18] CW-1 first reported to the Director of Accounts Receivable and Admissions and Billing & Reimbursement Supervisor Ashley Turczak and Director of Patient

27

Individual Defendants managed the reporting of information about collections, which included actively reviewing that information and providing feedback to those responsible for gathering and inputting the relevant data for reporting purposes. CW-1 relates that the Individual Defendants were given detailed monthly financial reports with information concerning collections, write-offs, outstanding balances, and money expected to come in, and other financial data related to collections and other departments of the Company. According to CW-1, discrepancies between amounts collected versus what was expected could be ascertained from the monthly reports provided to, and reviewed by, the Individual Defendants. Those differences between the contract price and what the Company received, quarter after quarter, were a red flag that put Defendants on notice of the very collection issues that made the Restatement necessary. At the very least, Defendants "[r]ecklessly turn[ed] a 'blind eye'" to such disquieting facts, which "is equally culpable conduct under Rule 10b-5." *VeriFone*, 704 F.3d at 708.

Evidencing the Individual Defendants' active role in overseeing the information about collections, CW-1 related that they often provided the collections department with feedback. CW-1 reported that the Individual Defendants micro-managed the Company and, given their receipt of the monthly reports and their

---

Admissions and Reimbursement Amie Matteson. Later, CW-1 reported to Manager of Patient Admissions and Reimbursement Kayla Bearce and Director of Accounts Receivable Suhai Sanders. ¶43.

subsequent feedback, knew about the Company's cash collections as related to the amounts being billed out by the Company. ¶¶43-44, 172.

Confidential sources need not be named "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Avaya*, 564 F.3d at 261 (internal quotation marks omitted). Here, the Complaint specifies when CW-1 was at the Company, CW-1's position at the Company, where exactly CW-1 worked, and the persons to whom CW-1 reported. ¶43. The Complaint also details the information the Individual Defendants regularly saw. ¶44. The confidential witness allegations are not devoid of detail and specificity, as Defendants claim.

A collection and reimbursement specialist at the Company for more than two years during the Class Period, who worked at the Company's corporate headquarters, certainly would be in a position to know about regular reports to the senior executives concerning collections, and the feedback the executives provided to the collections department.[19] Defendants do not explain why their active review of "detailed monthly financial reports" showing "monthly collections, write-offs,

---

[19] *Compare Rahman*, 736 F.3d at 244-45 ("neither CW2 nor CW1 had any way of knowing what was discussed in those closed-door meetings"); *In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978 (FLW) (LHG), 2019 WL 2849933, at *10 (D.N.J. July 2, 2019) (CW testimony was "nothing more than second-hand retelling and generalized rumor"); *Pharmanet*, 720 F. Supp. 2d at 555 (CW's "belief" "only based upon the Individual Defendants' positions within PharmaNet") (all cited Defs. Br. 26).

outstanding balances, and money expected to come in" (¶¶44, 172) does not show they knew, or were reckless in not knowing, that revenues were not being recorded in line with actual collections, *i.e.*, that the Company was not collecting what it was billing, and therefore that its accounting practices and reporting were not in line with GAAP and not sufficient, effective, or, most important, reliable.

Even if Plaintiff does not specifically allege that CW-1 directly reported to the Individual Defendants or had direct discussions with them, based on the feedback the Individual Defendants provided, CW-1 was in a position to know about their active review of the information they were given regarding collections and related matters. Defendants demand the sort of "smoking-gun" evidence that is not required. *See Tellabs*, 551 U.S. at 324; *Avaya*, 564 F.3d at 268-69 (inferring scienter even though plaintiffs do not point to any document or conversation that put defendants on notice of unusual discounting).

Moreover, any implication by Defendants that CW-1 is not to be believed is not appropriately addressed now. On a motion to dismiss, "factual issues concerning the credibility and weight of the employee statements will be construed in favor of Plaintiffs." *Lefkoe v. Jos. A. Bank Clothiers*, No. WMN-06-1892, 2007 WL 6890353, at *5 (D. Md. Sept. 10, 2007) (citing *Tellabs*). *See also Nakkhumpun v. Taylor*, 782 F.3d 1142, 1152 (10th Cir. 2015) ("a court cannot dismiss a complaint by assessing the credibility of an informant") (citing *Tellabs*); *In re NPS Pharms.,*

30

*Inc.*, No. 2:06-CV-00570, 2007 WL 1976589, at *5 (D. Utah July 3, 2007) ("just as the court will not weigh evidence at this stage, it will not entertain a challenge to the credibility of confidential witnesses").

## C.     Defendants' Massive GAAP Violations

Courts have held "significant GAAP violations" "may provide powerful indirect evidence of scienter. After all, books do not cook themselves." *In re McKesson HBOC, Inc.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). *See N.M. State Inv. Council v. Ernst & Young, LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (GAAP violations that "constitute . . . widespread and significant inflation . . . contribute to a strong inference of scienter.") (internal quotation marks omitted); *AFC Enter.,* 348 F. Supp. 2d at 1375 ("Allegations of GAAP violations, when coupled with other probative evidence of fraud, can create a strong inference of scienter."); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) ("when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter").

Here, Defendants' admitted GAAP violations resulted in the massive Restatement of five years of financial results – including every financial report since the Company first went public and was require to file financial reports with the SEC. The Restatement, which ultimately wiped out $15.2 million of previously reported

31

income during the relevant period, concerned a central issue with which Defendants had familiarity, were the crux of the alleged fraud, and had a substantial impact on the Company's bottom line for multiple years, consistently overstating net income (after the first two quarters of the Class Period). *See In re Hertz Global Holdings Inc*, 905 F.3d 106, 116 (3d Cir. 2018) ("The size and scope of a company's restatement of prior financial statements is one factor that courts consider . . . .") (citing cases); *AFC Enter.*, 348 F. Supp. 2d at 1375 ("The number and magnitude of the GAAP violations for the entire time that AFC was a public company suggest an extreme departure from ordinary care by a chief financial officer with this experience and background.").

By contrast with all these facts, the restatement at issue in *Hertz*, which Defendants rely upon for the proposition that Plaintiff cannot plead a strong inference of scienter:

> stemmed from misstatements relating to fifteen distinct accounting categories, causing Hertz to make twenty separate accounting adjustments to its previous financial statements. Those accounting errors were, in turn, a result of "four categories of material weaknesses in [Hertz's] internal control over financial reporting" . . . .

905 F.3d at 112. That is a far cry from this case where the core accounting issue that necessitated the Restatement was Defendants' failure to reconcile revenue and accounts receivable to actual cash collections and virtually all the restated numbers stemmed from that single issue. *See* ¶37. Moreover, that issue was not especially

32

complex, arcane, or novel notwithstanding Defendants' efforts to make it seem so. *Hertz* is distinguishable, and not dispositive here.

### D.   The Individual Defendants' Resignations and Punitive Measures Taken by the Company

Further bolstering a strong inference of scienter, Wilcox and Boucher both resigned under the cloud of the impending or active SEC and internal Audit Committee investigations into the Company's deceptive accounting practices. *See Hertz*, 905 F.3d at 118 ("The departure of corporate executive defendants is a factor that can strengthen the inference of scienter.") (citing cases); *DFC Global*, 2015 WL 3755218, at *17 ("[T]he resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior."); *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at *10-11 (W.D. Wash. Dec. 29, 2008) ("[B]ecause the changes in management occurred while Isilon was preparing its own internal investigation of revenue recognition practices, the departures 'add one more piece to the scienter puzzle.'") (citation omitted); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. Apr. 2, 2002) (changes in management "as Adaptive's financials were being restated and as Adaptive was conducting its own internal investigation" "add one more piece to the scienter puzzle").

Thus, Wilcox resigned as CFO on September 30, 2018. ¶¶5, 18. The very next month, October 2018, the SEC formally requested the Company provide documents

33

and information "relating to certain revenue recognition, collections and related matters," which then prompted the Audit Committee of the Company's Board to commence its own internal review, with the assistance of legal counsel and independent accounting advisors. ¶¶31, 37.

In turn, after less than six months, Wilcox's successor, Defendant Boucher, also resigned as CFO, effective March 26, 2019. ¶¶5, 34, 45, 169. Just the previous week, on March 21, the Company's Board concluded the Company's previously issued financials were not reliable and should be restated. ¶37. And, on March 28, just two days after Boucher resigned, the Company received the first of two subpoenas from the SEC. *Id.* Assigning blame, the Company stated Boucher had resigned as part of its "effort to remediate its material weaknesses associated with [its] control environment." ¶41.

In addition, Boucher's Separation Agreement gave him materially less than he would have been entitled to had he been terminated "without cause" or resigned for "good reason." Thus, instead of receiving 100% of his $400,000 base salary over a 12-month period and a pro-rata bonus, as his employment agreement provided, Boucher's Separation Agreement gave him only half that salary for only a six-month period. Boucher also agreed to forfeit all his outstanding equity awards, including all his restricted stock and stock options. ¶¶45-46.

The Company also pointed a finger at Carlucci. Because of the Restatement,

34

the Company's Board, with Carlucci's agreement, determined he should repay the Company $880,223 in bonus compensation the Company previously had paid him with respect to the Restated Periods. The Board also deemed it appropriate, and Carlucci agreed, that he will forego any contractual entitlements to non-equity based incentive compensation and equity awards for 2019. ¶¶9, 47, 175.

The circumstances of each CFO's resignation and the punitive measures against Boucher and Carlucci reflect the Company's assessment of who was responsible and further evidence the Individual Defendants' culpability. *See Adaptive Broadband*, 2002 WL 989478, at *14 ("the fact that the CFO was moved and former executives' severance payments were discontinued is highly suspicious"). All these facts "cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud." *Hertz*, 905 F.3d at 119.[20]

## E.   The Individual Defendants Had Personal Financial Motives

While "the absence of a motive allegation is not fatal,"[21] "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a

---

[20] *Compare Hertz,* 905 F.3d at 118 (complaint "lack[ed] allegations that those resignations were a result of the Individual Defendants' involvement in a systemic fraud"); *Synchronoss*, 2019 WL 2849933, at *18 ("Plaintiff has not provided any additional evidence to infer that the resignations are suggestive of fraud . . . .").

[21] Thus, allegations of insider trading are not required. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *Am. West*, 320 F.3d at 944. *See also Zak*, 780 F.3d at 607 ("allegations

35

scienter inference." *Tellabs*, 551 U.S. at 325. *See Hertz*, 905 F.3d at 119 ("Demonstrating that a defendant had a motive, such as personal financial gain, to commit a securities fraud violation . . . 'may weigh heavily in favor of a scienter inference[.]'") (quoting *Tellabs*, 551 U.S. at 325); *Curran v. Freshpet, Inc.*, No. 16-2263, 2018 WL 394878, at *6 (D.N.J. Jan. 12, 2018).

Defendant Carlucci had a compelling personal financial motive. During the Class Period, Carlucci's employment agreement entitled him to receive an annual cash incentive award if the Company achieved certain adjusted EBITDA targets.[22] By falsely inflating adjusted EBITDA during the Restated Periods, Carlucci received $880,223 in bonus compensation he later was forced to disgorge when, because of the Restatement, the adjusted EBITDA targets no longer were met, including for 2017 and 2018. ¶¶9, 47, 175; Complaint Ex. A at 130-31.

### F.    The SEC Put Defendants on Notice of the Accounting Issues

Even after the SEC began seeking documents and information in October 2018 concerning "certain revenue recognition, collections and related matters" (¶37)

---

of unusual stock sales are not required"); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not … infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."). Yet, during the Class Period, the Individual Defendants did benefit personally from using artificially inflated Company shares to pay their taxes. *See* n.24 below.

[22] Contrary to Defendants' chart which analyzes every metric as it relates to total revenues, Carlucci's cash bonus was determined by reference to the Company's earnings, not revenues.

36

– an obvious red flag that put Defendants on notice of the very accounting issues that caused the Restatement – Defendants continued to issue false financials. ¶173. The Company's third quarter 2018 Form 10-Q, filed November 9, 2018, among other untruths, overstated net income by $5.782 million. Defendants again gave false assurances that the financial statements complied with GAAP and provided SOX certifications signed by Carlucci and Boucher. ¶¶32, 160-67, 180.

"Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013). *See Am. West*, 320 F.3d at 943-44 (FAA letters and incident reports sent to America West show defendants' awareness of issues); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2014); *In re Am. Bus. Fin. Servs. Noteholders Litig.*, No. 08-0784, 2008 WL 3405580, at *3, 8 (E.D. Pa. Aug. 11, 2008) (allegations defendants ignored "red flags," including "strong comment letters from the SEC," amounted to "more than second-guessing or fraud by hindsight").

### G. The Individual Defendants Did Not Buy Any Company Stock on the Open Market During the Class Period

Defendants' argument that they increased their holdings of Company stock during the Class Period rings hollow. During the Class Period, none of the Individual Defendants purchased Company stock on the open market at the artificially inflated prices Class members paid. Instead, the Individual Defendants' Form 4 filings

(which, for the most part, Defendants chose not to cite) report that the only Company securities they acquired during the Class Period were cost free grants of restricted stock and options to purchase common stock, all with a reported price of $0, most of which did not vest, and therefore could not be sold, until after the Class Period.[23] In fact, that gave Defendants a strong incentive to keep inflating the Company's stock price until the options and restricted shares vested and could be sold.

And, insofar as can be discerned from the SEC filings Defendants rely on, which are not matched to the Class Period, the Individual Defendants' holdings consisted of options to purchase Company stock at below market prices; restricted stock; and, in the case of Carlucci, shares held by family trusts (U.S. Trust Company of Delaware, trustee), the terms of which are not disclosed. *See* Mortenson Dec. Ex. 4 at 156-57; Ex. 8 at 35-36; Ex. 9, Ex. 10, Ex. 11 at 38-39.

Moreover, the Individual Defendants' Class Period Form 4 filings reveal they benefited financially from their wrongdoing by using shares of stock, valued at the

---

[23] *See* Individual Defendants' Statements of Changes in Beneficial Ownership (Form 4s) for the Class Period (Aug. 10, 2016 to Mar. 27,2019):
https://www.sec.gov/cgi-bin/own-disp?CIK=0001696236&action=getowner (Boucher);
https://www.sec.gov/cgi-bin/own-disp?CIK=0001655251&action=getowner (Carlucci);
https://www.sec.gov/cgi-bin/own-disp?CIK=0001655266&action=getowner (Wilcox).

artificially inflated market price, to satisfy personal tax withholding obligations.[24]

\* \* \*

In light of all the foregoing, the inference, from the facts alleged, of conscious intent, or extreme recklessness, is at least as plausible, cogent, and compelling – and certainly no less so – than any non-fraudulent narrative Defendants might suggest.

## IV.     THE SECTION 20(a) CLAIM SHOULD NOT BE DISMISSED

Defendants' only argument for dismissing Plaintiff's §20(a) claim against the Individual Defendants is that the Complaint does not adequately plead an underlying violation of the Exchange Act. Because the Complaint does properly plead primary violations of §10(b) and Rule 10b-5, Defendants' argument fails.

## **CONCLUSION**

For all the foregoing reasons, Defendants' motion should be denied.[25]

---

[24] Carlucci reported 6,200 shares withheld on March 10, 2018, valued at $22.33 per share (the March 9, 2018 closing price), and another 11,646 shares withheld on March 9 and 10, 2019, valued at $10.46 per share (the March 8, 2019 closing price), a total benefit to him of $260,263. Wilcox reported 1,121 shares withheld on March 10, 2018, valued at $22.33 per share, a total benefit of $25,032. Boucher reported 478 shares withheld on March 10, 2018, valued at $22.33 per share, and 708 shares withheld on March 9 and 10, 2019, valued at $10.46 per share, a total benefit of $18,179. *See* n.23 above.

[25] While Lead Plaintiff believes it has more than adequately satisfied all the applicable pleading requirements, if the Court determines the Complaint is deficient in any respect, Lead Plaintiff respectfully requests leave to replead. *See* Fed. R. Civ. P. 15(a)(2); *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) ("[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile.").

Dated: February 24, 2020       Respectfully Submitted,

By: /s/   *Gary S. Graifman*
Gary S. Graifman
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, NJ 07645
Tel: (201) 391-7000
Fax: (201) 307-1088
GGraifman@kgglaw.com

*Liaison Counsel*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Mitchell M.Z. Twersky (admitted *pro hac vice*)
Atara Hirsch (admitted *pro hac vice*)
Todd Kammerman
Sean M. Handron-O'Brien (admitted *pro hac vice*)
One Penn Plaza, Suite 2805
New York, New York 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
MTwersky@aftlaw.com
AHirsch@aftlaw.com
TKammerman@aftlaw.com
Shandronobrien@aftlaw.com

-and-

Ian D. Berg (admitted *pro hac vice*)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Tel: (858) 764-2580
Fax: (858) 764-2582
IBerg@aftlaw.com

*Counsel for the City of Hialeah General Employees'
Retirement System, and Lead Counsel*

40