UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VANDEVAR, | . |
| | . |
| Plaintiff, | . |
| | . Case No. 19-cv-09074 |
| vs. | . |
| | . Newark, New Jersey |
| AMERICAN RENAL ASSOCIATES | . January 12, 2021 |
| HOLDINGS, INC., et al., | . |
| | . |
| Defendants. | . |

TRANSCRIPT OF SETTLEMENT HEARING
BEFORE THE HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

This transcript has been reviewed and revised in accordance with L. Civ. R. 52.1.

APPEARANCES (the parties appeared via teleconference):

For the Plaintiff:      GARY S. GRAIFMAN, ESQ.
                        Kantrowitz, Goldhamer & Graifman,
                        Esqs.
                        210 Summit Avenue
                        Montvale, NJ 07645
                        (201) 391-7000
                        Ggraifman@kgglaw.com

                        LAWRENCE LEVIT, ESQ.
                        Abraham, Fruchter & Twersky, LLP
                        One Penn Plaza, Suite 2805
                        New York, NY 10119
                        (212) 279-5050
                        llevit@aftlaw.com

Audio Operator:

Transcription Service:      KING TRANSCRIPTION SERVICES
                            3 South Corporate Drive, Suite 203
                            Riverdale, NJ  07457
                            (973) 237-6080

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(APPEARANCES continued)


For the Plaintiff:      TODD LESLIE KAMMERMAN, ESQ.
                        Abraham, Fruchter & Twersky, LLP
                        One Pennsylvania Plaza, Suite 2805
                        New York, NY 10119
                        (212) 279-5050
                        kammerman@aftlaw.com


For the Defendants:     GREGORY STEPHEN MORTENSON, ESQ.
                        Latham & Watkins LLP
                        885 Third Avenue
                        New York, NY 10022
                        (212) 906-1200
                        gregory.mortenson@lw.com

                        JASON C. HEGT, ESQ.
                        Latham & Watkins LLP
                        885 Third Avenue
                        New York, NY 10022
                        (212) 906-1686
                        Ejason.hegt@lw.com

<u>I N D E X</u>

<u>Proceeding</u>                                                    <u>Page</u>

   Proceedings                                               4

   The Court's Ruling                                        11

(Commencement of proceedings)

THE COURT:  All right.  We are on the record in Vandevar, et al., versus America Renal Associates Holdings, Inc., et al., Civil No. 19-9074, on the plaintiffs' unopposed application for final approval of the settlement, the plan of allocation, approval of an award of attorney's fees, reimbursement of expenses, and an incentive award for the plaintiff.

May I have appearances, please, beginning with plaintiffs' counsel.

MR. KAMMERMAN:  This is Todd Kammerman from Abraham Fruchter & Twersky, on behalf of the lead plaintiff in the class.

MR. LEVIT:  This is Lawrence Levit from Abraham Fruchter & Twersky, also on behalf of the lead plaintiff in the class.

MR. GRAIFMAN:  Good morning, Judge.  Gary Graifman from Kantrowitz Goldhamer & Graifman, liaison counsel for lead plaintiff in the class.

THE COURT:  All right.  Good morning.

Is that everybody for the plaintiffs' side?

UNIDENTIFIED SPEAKERS:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.  All right.

And on the defense side?

MR. HEGT:  Good morning, Your Honor.  Jason Hegt from Latham & Watkins for all defendants.  And with me on the line is my colleague Gregory Mortenson, also of Latham & Watkins, over all defendants.

THE COURT:  All right.  I would note that pursuant to the Court's order of preliminary approval -- and I will detail in a few minutes, the Court approved the notice to the class when it granted preliminary approval.  And the firm of -- if I mispronounce this, I apologize -- Angeion Group mailed out the notice, as well as undertook a number of other measures, including publication on PR Newswire and Investor's Business Daily to provide notice.

I have reviewed the declaration of Charles Ferrara, the senior business resource liaison at Angeion Group, as well as Mr. Ferrara's supplemental declaration filed on January 5th, which indicated that, at least as of January 4th, there had been no objections or requests for exclusion.

Let me just for completeness of the record, ask now, are there any individuals or persons on the call by way of objectors or any requests to exclude?

All right.  I hear none.

So, Counsel, I have thoroughly reviewed the papers submitted in support of the applications, as well as the

Ferrara declarations, Judge Phillips' declaration, Mr. Kammerman's declaration and attachments thereto, Mr. Twersky's declaration, as well as the Hialeah -- the plaintiff -- lead plaintiff's brief in support and attachments thereto, as well as Mr. Mortenson's declaration filed on January 6th, regarding defendants' compliance with § 1715 of Title 28 of the United States Code.

Having said all that, if either side wishes to add anything to what's already been put before the Court, I would hear you now.

I'll start with the plaintiffs' side.

MR. KAMMERMAN:  Good morning, Your Honor.  This is Todd Kammerman again from Abraham Fruchter & Twersky.

I do not have much to add of the papers, and if you would like me to review any of the factors, I'm happy to do so, although it sounds like Your Honor, you know, reviewed everything carefully.

I would just like to reiterate that we believe that this result is an outstanding settlement.  It's an outstanding result for the class.  As we pointed out in our papers, the $5.775 million settlement represents more than 9.8 percent of the class's maximum estimated damages in a very best-case scenario, which is more than double the average recovery obtained in class-action settlements between 2010 and 2019 alleging securities fraud.  And we believe that

the settlement is certain fair and reasonable -- certainly fair, reasonable, and adequate under the standards set down by Federal Rule of Civil Procedure 23(e)(2) and the Third Circuit in Girsh v. Jepson.

THE COURT:  All right.

I don't have any particular questions.  To counsel's credit, the submissions were comprehensive and extremely well prepared.

Is there anything on the defense side that counsel wants to add?

MR. HEGT:  No, Your Honor.  We don't have anything -- we didn't submit any papers.

The only point I would make, I wasn't going to, but in response to the point about maximum, you know, recovery, we certainly agree that this is a fine result for the class. You know, we don't know the origin of the maximum damages number.  I think we have a, you know, different view of what the potential exposure was in this case --

THE COURT:  Yeah.  Something that --

(Simultaneous conversation)

THE COURT:  -- strongly --

(Simultaneous conversation)

MR. HEGT:  You know, the --

THE COURT:  Something that will weigh strongly in favor of settlement when we get to the Girsh factors in

Rule 23.

MR. HEGT:  Yeah.  You know, these settlement hearings are -- is on the -- you know, a different side about what a likely recovery would have been, and at these settlement hearings, I suddenly find everyone likes the arguments we might have made.  But, you know, I don't think we need to resolve that here, other than to say, you know, we don't endorse or really even understand, you know, particularly that -- where that number comes from, but I don't think it changes the ultimate result.

MR. KAMMERMAN:  Your Honor, this is --

(Simultaneous conversation)

THE COURT:  No, I understand --

(Simultaneous conversation)

MR. KAMMERMAN:  -- and I --

THE COURT:  Go ahead, go ahead, Mr. Kammerman.

MR. KAMMERMAN:  I think that his statement underscores my point we said that's the outside maximum point of damages.  There are many scenarios where even if plaintiffs won on every point of liability, that, you know, that defendants would try to reduce that number.  So I think defendants' points there underscore our argument here.

THE COURT:  Well, I'm inclined to agree.

Is there any other parties on?  Again, I just want to make sure, especially since in light of COVID, we're

forced to do this remotely.

Any other parties on the call who wish to be heard pertinent to the plaintiffs' application for approval?

All right.  Hearing none --

MR. HEGT:  Your Honor, just one -- just one clarification, just --

THE COURT:  Yeah, do me a favor, though.  Just identify yourself first, because we have a bunch people on the line.

MR. HEGT:  Sorry.  It's Jason Hegt for the defendants.

So, you know, on the metrics that plaintiffs have been using with regard to potential exposure -- right? -- we -- of course, Mr. Kammerman's right.  We, of course, would have argued that there were no damages.  You know, but when looking at the, you know, theoretical maximum exposure and then implying a percentage, you know, recovery here, you know, we're not certain we even understand where the theoretical maximum number comes from, and I think, you know, there are views that the theoretical maximum could have been even higher than that number.  Again, we don't -- we don't know where that number came from.  That was certainly a higher maximum number with just a lower percentage recovery here.  So we're not -- we're not endorsing any of the numbers that plaintiffs have put forward.  They're not numbers we saw

in mediation, any of our prior discussions.  We don't -- we don't know the source.  We haven't seen any evidence regarding them.  They're just not numbers we can say anything about one way or the other, and, in fact, sort of, I think, we have, ourselves, a slightly different view.

THE COURT:  No.  I certainly recognize that.  I think -- as I said before, I think it goes to the risks of any recovery to the plaintiff, had this matter not settled for reasons that I'll articulate in a moment.  There is little doubt in the Court's mind that this matter as to both liability and damages would have been very vigorously contested.  It would have been extremely expensive.  Certainly, it would have required considerable expert testimony, all with an uncertain result.

I want to ask if counsel agrees with me.  It strikes me that -- I don't know how deeply I need to delve into the providence of the plaintiffs' 9.8 percent figure, because even applying a conservative number -- a more conservative analysis, say it yields 7 percent -- and I'm just throwing that out as an example; I have not done independent calculation, I assure you -- it still is significantly higher than the Cornerstone analysis for mean settlement, recovery in common fund cases for 2010 to 2019.  It strikes me, then, that the -- an analysis of how the plaintiffs got their 9.8 percent estimation isn't

particularly necessary.

Does anybody disagree with that?

MR. HEGT:  This is Jason Hegt again.

We don't -- we certainly don't think an analysis of how they got there is necessary.  I think they -- our view of the world, they would end up more in the heart of that range that Cornerstone published than on top of it.  If you look at the -- you know, what we think -- again, we don't think there was any great chance they would have recovered it, but the way we viewed the theoretical maximum, you know, we didn't view it as -- on the top of the range.  We viewed as sort of right in the heart of that range.

THE COURT:  Right.  And I think also plaintiffs' counsel was careful to express that that 9.8 percent is what they regard -- would regard as a maximum or most optimal recovery.

Is that correct, Mr. Kammerman, Mr. Levit, Mr. Graifman?

MR. KAMMERMAN:  Yes, Your Honor.  That is correct.

THE COURT:  Okay.  All right.

As I said, I'm familiar with this litigation, having served as the magistrate judge during its inception, having presided over the application for preliminary approval in September, when the parties consented to my jurisdiction. And for the reasons that I will articulate herein, I'm going

to grant the application for certification of the class, approval of the settlement, and the plan of allocation, the application for attorneys' fees and expenses, and the incentive award for lead plaintiff Hialeah.

Briefly by way of background, this is a securities class action brought on behalf of investors who purchased or otherwise acquired American Renal Associates -- or ARA -- common stock from August 10, 2015, to March 27, 2019.  The complaint asserts violations of the Securities and Exchange Act of 1934, specifically § 10b and 20A.

In sum, the plaintiffs allege that defendants made misrepresentations or material omissions of -- or omissions of material fact in -- regarding its financial results, particularly recognition of revenue, and that its internal accounting controls had certain vulnerabilities and that the company's financial statements did not comply with GAAP or -- restatement.

I will say at the outset, the settlement notwithstanding, the defendants have and continue to dispute liability, and for reasons that we briefly touched on and I will explore further in a few minutes, there is little doubt in this Court's mind, having perused in preparation for today, at least the briefing that was submitted on the motion to dismiss before the parties were able to settle the matter with the able assistance of Judge Phillips.  And I believe

that there would have been very significant and substantial arguments presented, even at the pleading stage in support of dismissal, not to say that those would have prevailed, not in the slightest, but, really, to highlight the extent to which this matter would have been litigated with vigor.

In July 2019, the Court granted the application to consolidate this action with the Giljohann case. That's 19-10416 and the related actions, and the matters were consolidated into this case. Hialeah was appointed -- for the plaintiff. AF&T was appointed as lead counsel, and the Kantrowitz firm was appointed to serve as liaison counsel.

After filing of the initial complaint, lead plaintiff continued investigating the allegations against ARA, and the consolidated amended complaint was filed in November 2019.

In January 2020, the defendants moved to dismiss. The plaintiff opposed. And the parties were able to reach settlement before briefing was completed. Notwithstanding their ability to do so, plaintiff conducted, during that period of time, an extensive investigation into their allegations. Among other things, they retained an investigator who interviewed former employees. They also were able to obtain information concerning reports that were provided to senior management at ARA regarding monthly collections, write off outstanding balances -- and expected

revenue that underscored the plaintiffs' allegations that the disclosures require restatement.

Plaintiffs' counsel or lead counsel retained an accounting expert as well as a damages expert, and, therefore, were able to assess the allegations of improper practices by ARA, compared to industry norms gap and auditing standards and thereby conduct an informed analysis of that lost causation, market efficiency, and damages.

So the Court is satisfied that by the time parties entered the mediation with Judge Phillips -- and certainly by the time they were able to achieve settlement -- Hialeah as lead plaintiff and lead counsel has procured extensive detailed information that may allow them to conduct an informed assessment of the strengths and weaknesses of the case, further informed by the defendants' arguments in support of their motion to dismiss.

In late February 2020, the parties engaged in a full-day mediation session with retired District Judge Layn Phillips, a renowned former district judge and mediator.  I have reviewed the declaration of Judge Phillips filed on December 15th, 2020, Docket Entry 58-8.  Judge Phillips notes that the mediation session lasted an entire day, and he regarded it as highly productive even though settlement was not actually achieved on that day.  But it did facilitate continued negotiation that culminated in the agreement

reached on March 11th, 2020.  Judge Phillips expresses in paragraph 8 of his declaration, "It is my belief that the mediation process in this case was hard-fought on both sides."  Judge Phillips further expresses that counsel for all parties, he believes, are of the highest caliber and were able to make an informed decision regarding settlement.  He also attests in his declaration that the representation provided by counsel for each of the parties was of the highest caliber, that the settlement -- this is in paragraphs 12 through 13 -- that the settlement was the end result of vigorous -- as he puts it, "vigorous and independent advocacy in both the context of litigation and the -- negotiations that were conducted in good faith, and that the deep understanding of the case and knowledge of the facts and legal issues at the heart of the case were reflected in the parties' ability to negotiate.

On March -- I'm sorry -- yes, on March 11th, 2020, the settlement parties executed a term sheet summarizing the primary terms of their agreement to resolve this action.  See e.g., Lane Phillips' Declaration attached as Exhibit 5 to the Kammerman Declaration.

And then on June 25, 2020, the parties executed the stipulation.

On September 3, 2020, I entered an order granting leave to plaintiffs' counsel's unopposed motion for

preliminary approval that preliminarily certified the class for settlement purposes; preliminarily approved the settlement as fair, reasonable, and adequate; and authorized that the notice be sent to the class.  See Preliminary Approval Order, Docket Entry 56.

The class is defined as follows:  "All persons that purchased or otherwise acquired shares of American Renal Associates Holdings Inc., common stock from August 10, 2016, to March 27, 2019, both dates being inclusive."  There are a number of exclusions from the settlement class such as -- defendants and their heirs and assigns, past and current officers and directors of ARA, immediate family members of any individual defendants, legal representatives of the individual defendants, Centerbridge Capital Partners and its subsidiaries and any entity in which any of the above persons have in majority ownership interest as well as, of course, opt-outs, of which there are none.

Turning to the first significant issue, whether the class meets the requirements of Rule 23, first, numerosity is easily satisfied.  Within the Third Circuit is made clear in the _In re_ NFL Players Concussion Injury Litigation, 821 F.3d 410 at 426 (3d Cir. 2016), within the Third Circuit, the Court has concluded that 40 class members is generally sufficient to satisfy the numerosity prong.  In this case, there are thousands, if not hundreds of thousands, of class

members, as reflected in the Ferrara Declaration and its documentation of the mailings.  In fact, on that issue, Mr. Ferrara declares that upon entry of the preliminary approval entry, Angeion caused 245 notice packets corresponding to the names of the transfer agent list to be mailed via first-class mail.  As is often true in cases such as this, the majority of the members are beneficial purchasers whose securities are held in -- name.  In other words -- by brokerage firms and institutions and other third-party nominees in the name of the nominee on behalf of the beneficial purchaser.  Those names and addresses are known only to the nominees.  Angeion caused 2,920 notice packets to be mailed via first-class mail.  That corresponds to the 2,920 nominees in the broker database.  Since the notice date, Angeion has received requests from nominees -- packets nominees for distribution or send the notice packet directly to the nominee's customers.  And, therefore, through December 15, 2020, because of the requests from the nominees, Angeion sent an additional 7,975 notice packets directly or indirectly to the potential settlement class members, for a total 11,140 notice packets being mailed by Angeion to the potential settlement class members.  That's, of course, in addition to the PR Newswire and Investor's Business Daily publications as well as the settlement class website.  In any event, numerosity is readily satisfied.

Second, I'm satisfied that the conduct alleged in the complaint was common to all members of the class.  In the Schering-Plough ERISA Litigation, 589 F.3d 585 at 597 n.10 (3d Cir. 2009), the Third Circuit noted that "only one question of law or fact in common is necessary."  In this case, the class members all purchased or otherwise acquired -- common stock during the class period, and therefore, the defendants' alleged misrepresentations and omissions were made to each class member.

Next, I'm satisfied that the class claims are interrelated and that the lead plaintiff's claims are typical of those of the rest of the class, again, for the reasons that I've just articulated.  Therefore, typicality is satisfied.

Next, I'm satisfied that Hialeah as lead plaintiff is an adequate representative of the class.  There have been no conflicts identified or made known to the Court with other class members.  Further, Hialeah retained counsel with extensive experience in the prosecution of securities class action litigation.  Hialeah has also been actively involved in the class, maintaining regular communications with counsel.  The Court is satisfied that Hialeah's representation as lead plaintiff has been adequate.

The class also satisfies the requirements of Rule 23(b)(3) in that common questions of law or fact

predominate over any individual question, and class action here is clearly superior to other methods of adjudication. The core issues in this action, in other words, whether the defendants publicly disseminated SEC filings and statements omitted or represented material facts is central to the case and clearly predominates over any theoretical individual issues that may arise. Similarly, the class action mechanism is far superior to resolve this litigation, given the identity of issues and damages or cause of alleged damages for each class member, the ability to adjudicate these claims in one suit is far more economical than individual adjudication of the claims. Moreover, as plaintiffs' counsel notes, it is very possible, if not likely that most of the class members' claims are sufficiently small enough that there may be a disincentive to litigating them in terms of incurring the litigation costs that it would take to do so, particularly in the face of such rigorous opposition.

I turn, although I briefly touched on it earlier, to the adequacy of the notice. Under Rule 23(e), "the Court must direct notice in a reasonable manner to all class members who would be bound by the proposal." That's at Rule 23(e)(1)(B). Moreover Rule 23(c)(2)(B) requires that the certified class receive basically the best notice that is practical under the circumstances.

As I said, I've reviewed the declaration of Charles

Ferrara.  I've already articulated the method of service, as I said earlier.  He's also -- notice was also provided or published via summary notice on the PR Newswire and Investor's Business Daily in late September 2020 and early October 2020 and set up the website for this settlement on September 28, 2020, well before the deadline for exclusions or objections.  And that website has continued today.

I am satisfied with the notice provided.  The notice apprises class members of the nature of the action, the class definition, the claims and issues in the litigation, and the claims that will be released in the settlement.  It also instructs class members how they may enter an appearance of counsel, if desired, /it explains the binding effects of the judgment on class members, the manner in which class members may exclude themselves, the time frame for doing so.  Similarly for objections, it provides the same information.  It also explains in detail the proposed plan of allocation, the anticipated requests for attorneys' fees and expenses, and the award to the plaintiff.  It also sets forth the procedure and the deadline for submitting a claim form to recognize any recovery from the settlement and the date, time, and location of the settlement hearing.

It also satisfies each of the requirements of the PSLRA's separate requirements as set forth in 15 U.S.C. § 78u-4(a)(7).  I'm therefore satisfied that the efforts here

to mail and publish the notice and establish a dedicated website as well as publication on PR Newswire and Investor's Business Daily constitute "the best notice practicable under the circumstances."  Rule 23(b)(2)(B).  See also In re Viropharma Inc. Securities Litigation, 2016 WL 312108 at *5-6 (E.D. Pa. 2016), wherein the court approved a similar notice and process in a securities class action settlement.

Having reviewed both the December 15, 2020, declaration of Charles Ferrara and Mr. Ferrara's supplemental declaration filed on January 5, 2021, see Docket Entries 58-4 and 59-1, the record reflects that there have been no objections to the settlement and no requested exclusions as of January 4, 2021.  Moreover, the Court at inception of this hearing and on the record allowed for the possibility that, at least theoretically, there may have been objectors or requests for exclusion that did not meet the filing deadline but had joined the hearing, and no individuals responded to the Court's call for response from any such person.

I now turn -- having found the foregoing, I now turn to whether the settlement warrants the Court's final approval, and for the reasons that I will explain now, I conclude that it does.  At the outset I note that the Third Circuit has consistently noted a strong preference for settling class actions where possible.  See In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516 at 535 (3d Cir.

2004). There are, as counsel are well familiar, a number of factors, both under Rule 23(e)(2) and recognized by the Third Circuit in Girsh that guide the Court in determining whether the settlement is fair and reasonable. Under Rule 23(e)(2), the Court must consider among the following factors, all that are applicable. Under Rule 23(e)(2)(A), class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the release provided for the class is adequate taking into account the costs, risks, and delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims, the terms of any proposed award of attorneys' fees, including the timing of payment and any agreement required to be identified under Rule 23(e)(3). The Court also must consider whether the proposal treats class members equitably relative to each other.

The Girsh factors are as follows: "(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of

reasonableness to the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

In this case, first, I find that lead plaintiff and lead counsel have adequately represented the class. This factor under Rule 23 too somewhat overlaps with the third Girsh factor. I must consider, among other things, the qualifications, abilities of the plaintiffs' lawyers to conduct the litigation and whether the interests of the lead plaintiff is sufficiently aligned with the interests of the absentees.

Lead counsel in this case is well regarded and well known for their superior ability in class action securities litigation throughout the country. I've reviewed the declaration of Mitchell Twersky, Exhibit C, which includes the lead counsel's firm résumé, and it details counsel's extensive experience in the area of the law. I also note the preliminary approval memo at page 24 listed a number of cases where counsel was appointed as class counsel and/or lead counsel. For reasons -- partially for reasons I've already articulated in terms of lead plaintiff being a suitable -- or Hialeah, rather, being a suitable lead plaintiff in terms of the alignment of interests, I would note further that Hialeah has a significant investment in ARA, incurred losses during

the class period.  There are no ostensible conflicts, and Hialeah clearly has a stake in the outcome of the litigation in that it seeks damages under federal securities laws for losses suffered through its purchases or acquisitions of ARA common stock during the class period.  Hialeah clearly is an adequate lead plaintiff.

Moreover, I would note that both lead plaintiff and lead counsel have diligently prosecuted this case on behalf of the class.  I've already detailed some of their efforts, but in the interest of completeness, I would also note their efforts also included investigating the claims against the defendants, retaining an investigator, as well as consulting with experts regarding accounting issues, accounting controls, GAAP, and damages, drafting a detailed complaint, opposing the defendants' motion to dismiss, and the extensive mediation efforts, both before the mediation with Judge Phillips, during the mediation with Judge Phillips, and after culminating in the March 11, 2020, agreement 's terms, and finally continuing in terms of preparing the motion papers and participating in this hearing.

As I said earlier, counsel and lead plaintiff have developed an adequate appreciation of the merits of the case. It is not uncommon for courts in this Circuit to approve class action settlements before the commencement of formal discovery.  For example, in the *In re* Johnson & Johnson

Derivative Litigation, 900 F. Supp. 2d 467 at 482 (D.N.J. 2012), the court noted that "even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties."  Clearly, that is the case here.

Moreover, in terms of the second factor of Rule 23(e)(2), in this case, the settlement was clearly negotiated at arm's length.  I don't need to dwell on this. I've already -- to the declaration of Judge Phillips, who detailed it far better than I could.

The settlement is certainly adequate, considering the costs, risks, and delay of trial and appeal.  This is the third factor of Rule 23(e)(2), and it requires courts to consider whether the settlement is adequate measured against the costs, risks, and delay that would inevitably accompany a trial and any appeal.  Securities class actions are inherently complex, different cases to litigate, much less successfully.  More often than not, I would dare say, they require extensive document discovery, depositions, and experts.  That is especially true where, as here, part of the claim concerns the adequacy of the accounting measures and allegations as to GAAP.

In this case, the defendants, as reflected at the outset of this hearing and in their opposition -- or motion

to dismiss, have steadfastly maintained that they are culpable for no wrongdoing and have no liability.  There is every reason to believe that, but for the settlement, they would have continued to challenge the plaintiffs' ability to establish the claims in the complaint.  Defendants have asserted that investors were not misled by any errors in ARA's financial statements or alleged GAAP violations, because the revisions to the financial statements simply weren't material.  To the contrary, the defendants have argued that the net impact of the restatements was that ARA had an increase in income, not a decrease, and, therefore, the company and the shareholders actually benefitted from the restatements.

Defendants also would have strenuously contested scienter, which I would note, being a former assistant U.S. attorney who tried fraud cases and as a magistrate judge, it is one of the most difficult fact-intensive elements for a party alleging fraud to prove.  The defendants have maintained that the individual defendants had no knowledge of the alleged errors, that they involved complex accounting issues, and that the allegations -- taken as true in the complaint were not indicative of fraudulent intent.

There is also every reason to believe that, had the litigation continued, in addition to vigorously contesting liability, the defendants would have also challenged the

plaintiffs' ability -- or their loss calculations and, indeed, the plaintiffs' ability to prove any loss or damages. The defendants would likely have asserted that the stock prices -- were a reaction to disclosures in the restatement proved that the misstatements were not material, and, further, that any damages were limited because most of ARA's common stock was held by institutional investors which had not purchased shares during the class period.

As I said, almost invariably, each side would have had to adduce expert testimony to present their loss causation arguments and damages experts to a jury at trial. There would have been almost equally certainly Daubert motions to exclude or limit, among other things, the plaintiffs' expert, and loss causation would have been reduced to the proverbial battle of the experts, thereby yielding an extremely uncertain and unpredictable jury result.

Not only would that have posed considerable risk to the plaintiffs and the class, it also would have resulted in years of litigation, and if there were an appeal, at least another two years of appellate practice. At each one of those stages, the plaintiffs would have had to have prevailed to recognize any recovery, and it would have been delayed by a factor of years.

Further, putting aside the uncertainty and the

time, it also would have cost millions of dollars in terms of continued litigation, trial, appeals, experts and the rest. The settlement provides an immediate recovery that eliminates the substantial expense, risk, and delay of furthering the action through such a costly and protracted and vigorously contested legal battle.

Next, I must consider whether the settlement falls within the range of reasonableness; that is, within "a range of reasonable settlements in light of the best possible recovery and in light of all of the attendant risks of litigation."  As counsel's comments at the outset of this hearing reflect, there is significant disagreement between the parties further to what I said about how this would have been vigorously contested but for the settlement, but vigorous disagreement between the parties as to the percent of recovery.  The plaintiffs assessed that the recovery here is approximately 9.8 percent of maximum damages.  The defendants believe that it's more in the median of the 4 to 5 percent estimated by Cornerstone research for recovery in class action security fraud cases between 2010 and 2019.  I believe the number for Cornerstone, actually, puts the average settlement at 4.6 percent of maximum estimated damages.  In any event, in this case, the settlement of $5.775 million is a very considerable recovery, even if using a much more conservative analysis in terms of whether it's

9.8 percent of maximum damages or not, would put it more likely than not at or above the median.  In either event, that is more than adequate to satisfy the eighth <u>Girsh</u> factor and Rule 23(e)(2).

The settlement also satisfies the remaining Rule 23(e)(2) factors.  That would include the effectiveness of the proposed method for distributing relief; the terms of the proposed attorneys' fees, which I'll address separately; and that whether it treats class members equitably relative to one another.

In terms of the proposed method for distributing relief, as reflected in the Kammerman Declaration, I'm satisfied that the method of providing notice of the settlement to the class and distributing the recovery pursuant to the claims administration process is effective. It provides class members with the necessary information for them to request and receive their pro rata share of the settlement.  These are processes are similar to those which are commonly used in securities class action settlements, and provide for straightforward cash payments based on trading information provided.

The parties, in terms of whether there are other agreements besides an agreement to address requests -- well, whether there are other agreements, there is a supplemental agreement that was set forth in the stipulation at paragraph

10.5 that provides the defendants have the option to terminate the settlement in the event that valid requests for exclusion from the class exceed the criteria set forth in the supplemental agreement.  This is standard practice for these types of cases, and, of course, we now know that there have been five requests for exclusion in any event.

In terms of whether the class members are treated equitably and whether the reaction of the class supports final approval, as I've already said probably several times, here, there are -- in terms of class reaction, there are zero objections and zero requests for exclusion.  I don't think it gets any better than that in terms of using the class reaction as a yardstick to determine adequacy of the settlement.

The class members under this proposal and the terms of the stipulation are treated equitably in that it provides each class member must submit a valid claim form and, therefore, will receive a pro rata share of the monetary relief based on the terms of the plan of allocation, which I will address shortly.  For those reasons and given the zero objections and zero quests for exclusion, that factor is easily satisfied.

I turn now to the plan of allocation.  The plan of allocation is spelled out on pages 5 to 7 of the notice.  I conclude that it provides a fair and very well measured and

comprehensive plan for distributing the settlement funds, based on a calculation of damages that class members likely suffered.  It's based on estimation of damages, and so, likely, it's imperfect, but a number of courts have held "a plan of allocation need not be perfect" and "need only have a reasonable rational basis, particularly as recommended by experienced and competent class counsel," as is the case here.  See Christine Asia Company Limited v. Yun Ma, 2019 WL 5257534 at *15 (S.D.N.Y. 2019).  Here, the plan of allocation was drafted in consultation with lead counsel's damages expert in order to fairly distribute the settlement funds based on the lead plaintiff's theory of damages and consistent with the allegations in the complaint.  It distributes the net settlement fund on a pro rata basis as established by the ratio that the authorized claimant's recognized claim bears to the total recognized claims of all authorized claimants.  That will depend on a number of factors, including when the ARA shares -- or common stock shares were purchased, acquired, sold, or held.  And as I've said, I've concluded, based on my review of the proposed plan of allocation and the record as a whole, that this method of distributing the settlement funds is fair, reasonable, and adequate, clearly has support of lead counsel as reflected in the Kammerman Declaration at paragraph 65, as well as the expert that lead plaintiff retained.

So for those reasons, I'm satisfied that the settlement satisfies each of the factors under Rule 23(e)(2) as well as the Girsh factors.

All that's left at this point are counsel fees and expenses and the plaintiff's award. I find that each of those elements is fair and reasonable and will grant approval.

Within the Third Circuit -- and for that matter, the Supreme Court -- it's well recognized that counsel's efforts to create a common fund for the benefit of the class entitle counsel to compensation from that common fund. See In re Cendant Corp. Securities Litigation -- known as a "In re Cendant II" -- 404 F.3d 173 at 197 (3d Cir. 2005). See also In re AT&T Corp., 455 F.3d 160 at 164 (3d Cir. 2006). One of the purposes of the common fund is to prevent unjust enrichment of class members who benefit from a lawsuit without paying for the costs. Here, counsel created a common fund for the class. It is well established within common fund cases that it's reasonable and appropriate to pay lead counsel's reasonable fees from that fund in order to properly compensate counsel for bringing and pursuing the claims in this case and to further the purpose of the security laws. Courts have consistently held that use of a -- recovery method is appropriate "because it allows courts to award fees from the fund in a manner that rewards counsel for success --

I'm sorry -- can everybody still hear me?

UNIDENTIFIED SPEAKERS:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  Sorry about that.

As I said, because it allows counsel fees -- sorry -- because it rewards counsel for success and penalizes it for failures.  See *In re* Rite Aid Securities Litigation, 396 F.3d 294 at 300 (3d Cir. 2005).  The percentage of recovery method is also consistent with the PSRLA in that § 78u-4(a)(6) provides that "total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."

In this case, I'm satisfied, based on any analysis of both the Gunter and Prudential factors that the requested fee award is fair and reasonable.  In Gunter v. Ridgewood Energy Corporation, 223 F.3d 190 (3d Cir. 2000), the Third Circuit established seven factors for courts to consider in determining whether a fee request is appropriate.  Those are as follows:  "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of

nonpayment; (6) the amount of time devoted to the case by plaintiff's counsel; and (7) awards in similar cases.

In the Prudential matter, the Third Circuit also counseled trial courts to consider additional factors in determining the fee award.  That would include the value of the benefits accruing to class members based on the efforts of class counsel as opposed to the efforts of other groups, such as the SEC or other government agencies conducting their own investigation; (2) the percentage fee that would have been negotiated, had the case been subject to a private contingent fee arrangement when counsel was retained; and (3) any innovative terms of settlement.  See In re AT&T Corp., 455 F.3d at 165.

In this case, the $5.775 million fund is substantial and confers cognizable benefits on the settlement class.  As counsel note, relatively speaking, this is a somewhat smaller securities action, as total possible damages are approximately $59 million.  But adopting, at least for the sake of argument, the plaintiffs' estimate of maximum damages, the settlement may represent a recovery of up to 9.78 percent of them.  As I've already described, Cornerstone puts the average class -- or the median, rather -- settlement percentage at 4.6 percent.  Therefore, whether I use 9.8 percent or a more conservative number or even adopt the defendants' estimate that any settlement is more -- is closer

to the median, this element is satisfied.  And it still constitutes a very substantial recovery for this case.

Case law establishes reliable precedent for a fee award of 30 percent to 33 percent of the fund, even in smaller cases.  See for example, Dartell v. Tibet Pharmaceuticals, 2017 WL 2815073 at *8-9 (D.N.J. 2017).  See also In re Akari Therapeutics Securities Litigation, Civil No. 17-3577 (S.D.N.Y.), wherein the court awarded one-third of a $2.7 million settlement.  The court also must consider that no class members have objected to the settlement, nor have any sought -- or rather, filed exclusion requests, notwithstanding the some 11,140 copies of the notice and proof of claim and a release form that Angeion had submitted to potential class members or publication on the PR Newswire, Investor's Business Daily, or the website.  That is certainly a fair and necessary consideration in assessing the fee application.

In view of the disclosure of anticipated fee application in the notice and the class's positive reaction, it's reasonable for the Court to infer that the class's positive reaction strongly supports the fee request.  See In re Orthopedic Bone Screw Product Liability Litigation, 176 F.R.D. 158 at 185 (E.D. Pa. 1997).  I also conclude that lead counsel prosecuted this action with skill and efficiency.  As one of my colleagues noted in In re Ocean Power Technologies,

2016 WL 6778218 at *27 (D.N.J. 2016), "the single clearest factor reflecting the quality of class counsel services for the class are the results obtained."  In the face of vigorous opposition, counsel -- and after what Judge Phillips, I believe, had discussed as very hard-fought negotiations, both during the all-day mediation session and in the immediate wake of it, the recovery here is certainly impressive and supports the requested fee.

I've already touched on the experience of lead counsel and need not dwell on that here.  It was expressed by the Court early, as reflected in Judge Phillips' declaration, it easily satisfies the Third Circuit's standards in support of the fee application here.

I would note as well that plaintiffs' counsel was up against extremely well-experienced, nationally renowned litigators from Latham & Watkins throughout these litigations.  The quality and vigor of opposing counsel is certainly a fair consideration in determining the quality of the services provided by lead counsel.  See In re Ikon Office Solutions Securities Litigation, 194 F.R.D. 166 at 194 (E.D. Pa. 2000).  See also Warner Communications and Securities Litigation, 618 F. Supp. 735 at 759 (S.D.N.Y. 1985).

I turn to the next Gunter factor, the complexity, expense, and likely duration of litigation and whether those

weigh in favor of lead counsel's request.  I've already articulated in the context of finding the <u>Girsh</u> factors and the Rule 23(e)(2) factors that the complexity, expense, and likely duration of this ligation all supported approval of the settlement.  Those same considerations strongly weigh in favor of lead counsel's request, and I need not dwell on those here.

Another factor, though, that I have not previously addressed is that lead counsel undertook this action on an entirely contingent-fee basis, which, of course, comes with it, the risk that the litigation would yield no or very little recovery, leaving counsel uncompensated for their time as well as the out-of-pocket expenses.  As the Fifth Circuit has noted in <u>Alaska Electric Pension Fund v. Flowserve</u>, 572 F.3d 221 at 235 (5th Circuit 2009), the risk is exacerbated in PSRLA cases, because it's the nature of the PSRLA, that it's become more difficult for investors to bring and successfully sustain securities class action.  In the <u>Flowserve</u> case, as this Circuit noted, "that to be successful, a securities class action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."  And, as I said earlier as well, when one factors in the attendant risk of establishing factors such as scienter, materiality, and damages, the risk undertaken by plaintiffs' counsel becomes

even more salient.

Counsel also spent significant time investigating and litigating the action.  I've already articulated those factors, and, again, I need not dwell on those here, except to note that all of those steps, none of those was superfluous or perfunctory.  They were all entirely necessary and reasonable in order to successfully press a sophisticated class action case such as this one and to achieve a successful result in mediation.

Next, I must consider whether the 30 percent fee requested here is appropriate and within the range of fees awarded in similar cases.  In *In re* General Motors Pick-up Fuel Tank Product Liability Litigation, 55 F.3d 768 at 822 (3d Cir. 1995), the Third Circuit remarked that fee awards typically range from 19 percent to 45 percent of the settlement fund.  Moreover, fee awards of 30 percent are not uncommon in securities fraud class action cases.  See, for example, *In re* Merck & Company Inc. Vytorin ERISA Litigation, 2010 WL 547613 at *11 (D.N. J. 2010), wherein the court noted that "review of 289 settlements demonstrates average attorney's fee percentage of 31.711 percent with a median value that turns out to be one-third."  Moreover, a number of other cases, both within this district and outside of this district have also awarded similar fees rather and similarly in that roughly 30 to 33 percent range.

Another particularly notable characteristic or factor that weighs in favor of the fee application is that unlike a number of cases where the complaint piggybacks on SEC action or another government enforcement proceeding, that was not the case here. This action stood on its own, heightening the risks that lead counsel undertook in pursuing this action and negotiating a settlement. As the Third Circuit noted in the AT&T case, 455 F.3d at 173, that is a, quote/unquote, significant factor supporting the fee award.

It's also -- the 30 percent fee award is also consistent with fee awards in nonclass cases. See, for example, In re RJR Nabisco Securities Litigation, 1992 WL 210138 at *7 (S.D.N.Y. 1992).

Finally, a lodestar crosscheck, which is advised but not mandatory, see Moore v. GMAC Mortgage, 2014 WL 12538188 at *2 (E.D. Pa. September 19, 2014) at least roughly confirms the validity of the 30 percent fee award here.

A number of courts, I think it's important to note, as counsel did in their brief, have cautioned that a undue emphasis on lodestar does run the risk of "penalizing class counsel for achieving a settlement" earlier in the litigation, which could work against the interests of the class and as well as against the interests -- public interest in early resolution of litigation. That's not to dispense with the lodestar factor, but to put it in its -- or lodestar

crosscheck, but to put it in its appropriate context.

In this case, lodestar, in other words, the value of the work, had it been paid, would be a hair under $1.3 million for 1,673.35 hours.  That would include all of the tasks previously mentioned.  One thing it certainly would not take into account, because plaintiffs' counsel couldn't possibly have billed for it yet, would be this hearing or the inevitable work that plaintiffs' counsel will have to do in administering the settlement from here on out.  In any event, the lodestar here is approximately 1.33.  See paragraph 87 of the Kammerman Declaration.  That 1.33 lodestar is well within the range of percentages that the Third Circuit has recognized as valid.  See In re Veritas Software Corp. Securities Litigation, 396 F.App'x 815 at 819 (3d Cir. 2010). See also Stevens v. SEI Investments, 2020 WL 996418 at *13 (E.D. Pa. 2020), wherein the court approved a multiplier of 6.16, noting that "multiples ranging from 1 to 8 are often used in common fund cases" and recognizing that it fairly compensated counsel for the risks inherent in taking cases on a contingent-fee basis.

And as I have briefly alluded to earlier, it is appropriate.  See In re Equifax and Customer Data Breach Litigation, 2020 WL 256132 at *39 (N.D. Ga. 2020) to recognize that there will be future time that's not reflected in the lodestar crosscheck that counsel will undertake in

administering the settlement, assisting class members with their proof of claim forms, shepherding the claims process, and responding to class member inquiries.

For all of those reasons, I find that the fee application is appropriate.

In terms of the request for reimbursement of expenses totalling $53,755.80, I need not spend a lot of time here. I've reviewed the filings in conjunction with those fees. The fees are reasonable and adequate. They take into account, among other things, litigation preparation costs, investigators, the financial accounting experts, as well as the plaintiffs' half of the mediation expenses, mediation, of course being critical to achieving the settlement that I've approved today. Those, as well as, of course, the inevitable online legal research fees and filing fees and other miscellaneous fees, those are all clearly appropriate and charged to the class.

I therefore, approve the expense request.

Finally, I turn to lead plaintiff Hialeah 's application for a nominal award or the application made on behalf of Hialeah by lead counsel, for the nominal award. The PSRLA and the legislative history of PSRLA recognize the validity of a reasonable incentive award. See § 78u-4(a)(4). And the Third Circuit and district courts within the Third Circuit have regularly approved incentive awards under

§ 78u-4(a)(4) to compensate institutional class representatives for their time and effort in representing the class.  See, for example, Schering-Plough 2, 2013 WL 5505744 at *37.  See also Schuler, 2016 3457218 at *11.

This Court is also very well familiar with the range of awards and finds that $7500 is more than fair and reasonable under the circumstances.  There have been no objections raised in response to the application.  I also am satisfied from the Hialeah Declaration that was filed in support of the application as well as Hialeah's briefing, that Hialeah was extensively involved in the litigation, working with lead counsel and conferring with counsel regarding the mediation and the settlement and remaining available to lead counsel as needed throughout the litigation and the mediation and therefore pursued its obligations with attentiveness and conscientiously.  Accordingly, I find that the award is reasonable and appropriate and, therefore, will grant it.

All right.  So I have granted each of the applications.  I am now -- the proposed order and final judgment, so let me do that first.  I've reviewed in preparation for the hearing so they fairly and accurately reflect my findings.

I also am signing the order awarding lead counsel attorneys' fees reimbursement and Hialeah's award.

Hold on.  All right.

So I'm on the order awarding lead counsel's attorneys' fees.  I just want to make sure, having come this far, that we're all on page -- in terms of the blank.  So in paragraph 1 under the "it is hereby ordered" provision on the second page, lead counsel's awarded 30 percent of the settlement fund -- or let me go back to the application to put in the actual number -- it's 1 point ...

MR. KAMMERMAN:  Your Honor, this is Todd Kammerman.

THE COURT:  Yeah, go ahead, please.

MR. KAMMERMAN:  I just note two things.  First of all, I can give you the number, but we also, when we served courtesy copies to your chamber, we also, aside from the -- the attorneys' fees order with the blanks, we also gave you one with the amounts filled in.

THE COURT:  Oh, actually.  Do me a favor, just read them out, because I don't -- oh, here it is.  Here's the number I have, because I don't have those in front of me, because I wanted to use ones that were not -- that didn't have the courtesy copy stamp on it.

It's 1,732,500.  Right?

MR. KAMMERMAN:  That's correct.

THE COURT:  Okay.  So 1732, 500, point 00.

Expenses, which I said only a minute ago -- here we go -- $53,755.80.  Right?

MR. KAMMERMAN:  That's correct, Your Honor.  Thank you.

THE COURT:  Okay.

Let me see.  Are there any other blanks in here?

That is good.  Yeah.  $7500 in paragraph 5 is the incentive award to Hialeah.  Right?

MR. KAMMERMAN:  That's correct.

THE COURT:  Okay.  Let me just double-check, make sure I didn't write anything wrong.  Yup, yup, yup.

Okay.

I have executed both orders, and we'll get those up on the docket, if not today, then tomorrow.

MR. KAMMERMAN:  Great.  Thank you so much.

THE COURT:  All right.

Is there anything else --

MALE SPEAKER:  Thank you, Judge.

THE COURT:  -- for plaintiff?

Sure.  No, thank you for the excellent briefing and for settling, because this would have been a very time-consuming case otherwise.

Anything for plaintiff?

MR. KAMMERMAN:  That's it, Your Honor.  Thank you.

THE COURT:  All right.  Anything for the defense?

MR. HEGT:  Your Honor, thank you for your time both on this and the other related matter.  We appreciate it.

THE COURT:  It's my pleasure, Counsel.  It's a pleasure working with you.  And I wish everybody well.  Thank you again for all your efforts.

UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

THE COURT:  All right.  We're adjourned.

(Conclusion of proceedings)

|Settlement Hearing
|19-cv-09074, January 12, 2021
|Certification

46

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 46 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

s/ *Sara L. Kern*                          25th of January, 2021
_____     _____
Signature of Approved Transcriber              Date

Sara L. Kern, CET**D-338
King Transcription Services
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080